Emily ADLER, individually; on behalf of herself and all persons similarly situated, Seth Finck, individually; on behalf of himself and all persons similarly situated, et al., Plaintiffs-Appellants,

v.

DUVAL COUNTY SCHOOL BOARD, Duval County Public School District, Defendants-Appellees.

Emily Adler, individually; on behalf of herself and all persons similarly situated, Seth Finck, individually; on behalf of himself and all persons similarly situated, et al., Plaintiffs-Appellees,

v.

Susan Boles, as parent & next friend of Rebecca Boles, a minor child and on behalf of all public school students within the Duval County Public School District, Movants-Appellants.

Nos. 98-2709, 98-2720.

United States Court of Appeals,

Eleventh Circuit.

May 11, 1999.

Appeals from the United States District Court for the Middle District of Florida. (No. 98-460-Civ-J-10C), Wm. Terrell Hodges, Judge.

Before HATCHETT, Chief Judge, MARCUS, Circuit Judge, and KRAVITCH, Senior Circuit Judge.

HATCHETT, Chief Judge:

Appellants, students of various grade levels in the Duval County, Florida school system, challenge the Duval County school system's policy of permitting graduating students to vote on whether to have unrestricted student-led messages at the beginning and closing of graduation ceremonies as facially and as-applied violative of the Establishment Clause. We hold that this policy facially violates the Establishment Clause, reverse the district court's denial of appellants' motion for preliminary injunction and dismissal on the merits and remand for further proceedings consistent with this opinion.

I. BACKGROUND

Prior to 1993, public schools in Duval County, Florida, permitted religious officials to conduct formal prayers during graduation exercises. The Supreme Court, however, ruled in 1992 that school-sponsored prayer at public school graduation ceremonies violated the Establishment Clause. *Lee v. Weisman,* 505 U.S.

577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). Following *Lee,* Duval County Public School Superintendent Larry Zenke, at the direction of Vicky Reynolds (the school system's Liaison for Legal Affairs), issued a memorandum instructing all school officials in the Duval County school system to end the practice of having prayer at graduation ceremonies.[1]

Soon after issuing this memorandum, the school system began receiving input from students and members of the community regarding ways to continue prayer at graduation ceremonies despite the *Lee* decision.[2] Reynolds and Superintendent Zenke met to decide whether they could change the school system's

---

[1]The memorandum (dated July 22, 1992) read, "This memorandum is to remind you that due to the recent Supreme Court Ruling in *Lee v. Weisman,* there should be no prayer, benediction, or invocation at any graduation ceremonies."

[2]For example, Calvin Carr, the High School Director for First Baptist Church in Jacksonville, wrote the following letter (dated March 3, 1993) to Reynolds:

> Thank you for being patient with me as I continue to "fish" for ways to incorporate prayer in our graduation ceremonies. I want you to know that I see it as a tragedy to allow one year to go by without having prayers—something that's been done in our country for over one hundred years.
>
> I am enclosing a copy of a bulletin that has been published from the Center for American Law and Justice. In that publication they allege that the Lee vs. Weisman case only stops school officials from inviting clergy to give prayers. Evidently Justice Kennedy made it clear for the majority that the court's decision was limited to the particular facts before the court (id. at 2655). Thus, any change from the factual situation presented in Lee might alter the resulting opinion of the court.
>
> Also, it points out that one Federal Appeals Court has already ruled that a majority of students can do what the state acting on its own cannot do to incorporate prayer in public school graduation ceremonies. Vicky, I'm not trying to be a "stick-in-the-mud." I just want to find a legal way our young people can have prayer at their graduations. It is going to be a sad day when we wipe them out of Duval County. Please help me to understand these rulings in this bulletin and I greatly appreciate your concern and help.

Other evidence of this community pressure includes a memorandum that Reynolds circulated entitled "Legal Opinion-Graduation Prayer" to Duval County School Board Members that stated:

> For about a month my office has been receiving calls from principals asking for guidance as to the status of prayers at graduation. Students and parents had been informing them that there had been a change in the status due to a recent Court case and that student-led and initiated prayer was now acceptable.

policy of no prayer at graduation ceremonies because of this input and the Fifth Circuit's decision in *Jones v. Clear Creek Indep. Sch. Dist.,* 977 F.2d 963 (5th Cir.1992), *cert. denied,* 508 U.S. 967, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993). Thereafter, Reynolds, under the supervision of Superintendent Zenke, circulated the following memorandum dated May 5, 1993, referenced "Graduation Prayers," to all high school principals in the Duval County school system:

> You will recall that after the 1992 Supreme Court case of *Lee v. Wiseman,* [sic] you received a memorandum from me instructing that because of the decision, we would no longer be able to have prayers at graduation ceremonies. Most of you have recently been bombarded with information, as have I, regarding whether or not *student* initiated and led prayers are acceptable based upon a recent Fifth Circuit opinion. The purpose of this memorandum is to give you some guidelines on this issue if the graduating students at your school desire to have some type of brief opening and/or closing message by a student.

> This area of the law is far from clear at this time, and we have been threatened by lawsuits from both sides on the issue depending on what action we take. The key to the *Lee v. Wiseman* [sic] decision was that the prayer given at that graduation ceremony was directed and initiated by the school system, which made it unconstitutional, rather than by permissive student choice and initiative. With that premise in mind, the following guidelines may be of some assistance:

1.  The use of a brief opening and/or closing message, not to exceed two minutes, at high school graduation exercises shall rest within the discretion of the graduating senior class;

2.  The opening and/or closing message shall be given by a student volunteer, in the graduating senior class, chosen by the graduating senior class as a whole;

3.  If the graduating senior class chooses to use an opening and/or closing message, the content of that message shall be prepared by the student volunteer and shall not be monitored or otherwise reviewed by Duval County School Board, its officers or employees;

> The purpose of these guidelines is to allow the students to direct their own graduation message without monitoring or review by school officials.

After issuance of this memorandum, the Duval County School Board met to decide whether they could adopt a policy allowing a "moment of silence" at graduation ceremonies. In their discussion of the "moment of silence" policy, the School Board members also discussed the guidelines set forth in the Reynolds memorandum, and the permissibility of prayer at graduation ceremonies. The School Board voted the "moment of silence" policy down, in part to allow the guidelines in the Reynolds memorandum to stand, and in part based upon their understanding of *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29

(1985).[3] The School Board never voted specifically on the guidelines set forth in the Reynolds memorandum;

"that memorandum was left in force with the acquiescence or tacit approval of the Board as its official policy

---

[3]At the June 1, 1993 meeting in which the School Board considered the "moment of silence" policy, the School Board members voted the policy down 4-3. The comments of those School Board members that opposed the moment of silence, however, show that their intention in denying a moment of silence was to permit the individual schools to utilize the guidelines from the Reynolds memorandum.

> Parker: But in good conscience I cannot vote to allow our '93 graduating class to have a few minutes of silent meditation when we all know that in the past some one has prayed out loud to thank the Lord for the 12 great and successful years in school during this period of time. And now we want silence.... I think that our school principals should be allowed to work out a non-sectarian message with our student chaplains, or a guest minister, rabbi or whatever that would be acceptable to all at this very important time in our young people's lives.

> Buckley: If we leave it [the Reynolds memorandum] as it is we have not told anybody to do anything or prevented them from doing anything. And that's what I feel we should do. If we pass this motion as it is on the floor we are putting ourselves into it and saying you shall not pray. You shall have a moment of silent meditation and therefore we are injecting ourselves into what is happening at graduation. And I think the only way we can keep ourselves clear on this thing is to keep ourselves out of what happens in this area of the graduation ceremony.

> Corwin: God is not going away. Neither is our godly heritage for which American patriots sacrificed their lives and fortune from the time of the American revolution through Desert Storm. Americans who believe this have rights, too. The free public education system in America is based on the principles of good citizenship. I truly believe that this Board is dedicated to the premise that acceptable standards of conduct be formed in our students including self respect and respect for others regardless of race or religion. I also believe that the democratic process in which seniors were given the ability to choose which form of inspirational message, if any, they wanted at their commencement was an appropriate one and I'm going to stand by it.

> Jordan: In 1962, the Bible went out of the school and in 1992-93 the bullets come in. You don't have to be a brain surgeon to figure out that where we're going in America, black and white, rich and poor, Hispanics, Asians, what have you, our security is threatened. There is an old saying if you like what you're getting, keep doing what you're doing. And how long is it going to be before someone challenges that the class of '93 is unconstitutional because the class of '93 is named after the year of our Lord, 1993? Now how absurd are we going to take these special interest groups that are fanning their particular agenda at the expense of the best interest of this country? Mr. Chairman, I plan to vote for the administration plan and against the proposal that's on the table.

4

governing the 1993 commencement exercises." *Adler v. Duval County Sch. Bd.,* 851 F.Supp. 446, 449 (M.D.Fla.1994) (*Adler I* ).

High school principals in Duval County thereafter began implementing the guidelines in the Reynolds memorandum through delegating decision-making authority to graduating senior students at each school to determine: (1) whether they should allow student messages at the opening and/or closing of the graduation ceremony; and (2) who should give these messages. *See Adler I,* 851 F.Supp. at 449 n. 4 (describing how each individual school delegated this decision-making authority). With regard to the 1993 graduation ceremonies, seniors at 10 of the 17 Duval county high schools opted for messages that constituted various forms of religious prayer. The seniors at the remaining 7 schools opted either for no message or for messages that were entirely secular. As the parties have not had the opportunity to develop the record fully for graduation ceremonies following 1993, it is unclear how subsequent graduating classes conducted the message portions of their graduation ceremonies.[4]

## II. PROCEDURAL HISTORY

In June 1993, various Duval County public school students sued the Duval County school system, alleging that the policy embodied in the Reynolds memorandum constituted an establishment of religion and infringed on their free exercise of religion. These students sought equitable relief through a judgment that declared the policy unconstitutional and enjoined the Duval County School Board from permitting prayers at high school graduation ceremonies, and additionally sought money damages.[5] The students also sought to certify their action as a class action. The district court denied the motion to certify the class and granted summary judgment in favor of the Duval County school system, holding that its policy was constitutional.

[4]Appellants have submitted the programs from Duval County High School graduations for years subsequent to 1993. Some of these programs indicate that student "leaders" or "chaplains" gave "messages," "invocations" and "benedictions" at these ceremonies.

[5]These "original" plaintiffs consisted of the following students: Emily Adler, Laura Jaffa and Robin Zion. Robin Rand later joined the action.

*See Adler I,* 851 F.Supp. at 451-56. The students appealed, and a panel of this court found that because the students had all graduated, their claims for declaratory and injunctive relief were moot. *See Adler v. Duval County Sch. Bd.,* 112 F.3d 1475, 1477-78 (11th Cir.1997) (*Adler II* ). The *Adler II* court also held that the students waived their damages claim on appeal. *See Adler II,* 112 F.3d at 1480-81.

Appellants brought the instant action in May 1998 against the Duval County school system, again alleging that the policy embodied in the Reynolds memorandum constituted an establishment of religion and infringed on their free exercise of religion.[6] Appellants sought preliminary and permanent injunctive relief against the Duval County School Board from permitting, conducting or sponsoring any religious exercises, prayer and instruction within the Duval County Public School District, including School Board-sponsored graduation ceremonies. Appellants also sought monetary damages and class certification. The district court, at the hearing on appellants' motion for a preliminary injunction, advanced the case on the merits because the action "presents precisely the same claims predicated upon the same constitutional theories or contentions [as *Adler I* ]; and ... counsel stipulated that the operative facts remain unchanged." *Adler v. Duval County Sch. Bd.,* No. 98-460-CIV-J-10C (M.D.Fla. May 27, 1998). The district court denied appellants' motion for preliminary injunction and entered final judgment in favor of the Duval County School Board, holding that the law had not evolved in appellants' favor and that high school graduation ceremonies were designated, limited public fora.

III. ISSUE

---

[6]Appellants in the instant action include: Emily Adler, a June 1998 graduate of Mandarin High School; Seth Finck, a June 1998 graduate of Stanton College Preparatory School; Stella Finck, as mother of Rachel Finck, planning to graduate from Stanton College Preparatory School in 1999, Aaron Finck, planning to graduate from Stanton College Preparatory School in 2000 and Duval County Public School student Benjamin Finck; Roberta Nord, mother of Duval County Public School Students Lucy Nord, age 9 and Tyler Hurley, age 12; and Jonathon Rand, a June 1998 graduate of Stanton College Preparatory School.

The issue we discuss is whether the Duval County school system's policy of permitting graduating students to vote to have unrestricted student-led messages at the beginning and closing of graduation ceremonies is facially violative of the Establishment Clause.[7]

IV. DISCUSSION

*A.        Framework of Analysis*

The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion...." U.S. Const. Amend. I.[8] The first problem that we must confront is the framework of analysis to use in determining whether a policy that permits students to vote on whether to have uncensored student-led messages at public school graduations violates the Establishment Clause. The long-established three-prong test for analyzing Establishment Clause challenges enunciated in *Lemon v. Kurtzman* provides that to survive an alleged violation of the Establishment Clause, the challenged statute or policy must: (1) have a secular purpose; (2) have a principal or primary effect that neither advances nor inhibits religion; and (3) not foster excessive entanglement with religion. *See* 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). In *Lee v. Weisman,* the Court declined to apply the *Lemon* test in holding that a policy of school-sponsored prayer at public school graduation violated the Establishment Clause, and instead found that the following "dominant facts" controlled their decision: (1) state officials directed the performance of a formal religious exercise at graduation ceremonies; and (2) even for those students who objected to the religious exercise, their attendance and participation in the state-sponsored religious activity

---

[7]Appellants also allege that the district court abused its discretion in consolidating the merits of their claim with the hearing on their motion for preliminary injunction. As appellants consented to this consolidation, we find no abuse of discretion.

[8]The Establishment Clause applies to the states through the Fourteenth Amendment. *See Everson v. Board of Educ. of Ewing,* 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). As long as state action is present, a lack of statutory authorization does not limit the reach of the Establishment Clause. *See Jager v. Douglas County Sch. Dist.,* 862 F.2d 824, 828 n. 7 (11th Cir.), *cert. denied,* 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989).

"are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma." *See Lee,* 505 U.S. at 586, 112 S.Ct. 2649.

Members of the Court and other commentators have questioned the continued vitality of the *Lemon* test.[9] In *Lamb's Chapel v. Center Moriches Sch. Dist.,* the Court stated that it had not overruled *Lemon.* 508 U.S. 384, 395 n. 7, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) ("we return to the reality that there is a proper way to inter an established decision and Lemon, however frightening it might be to some, has not been overruled."). Additionally, the *en banc* court in *Chabad-Lubavitch of Georgia v. Miller* held that "although [*Lemon* ] has been criticized severely, it still controls our Establishment Clause inquiry." 5 F.3d 1383, 1388 (11th Cir.1993) (*en banc* ); *see also Bown v. Gwinnett County Sch. Dist.,* 112 F.3d 1464, 1468-74 (11th Cir.1997) (applying *Lemon* ). Thus, we will conduct our Establishment Clause inquiry of the Duval County school system's policy under both *Lee* and *Lemon.* As the district court's final order for our review concludes that *Adler I,* granting summary judgment in favor of Duval County, remained the proper decision, we review this case *de novo. See Taylor v. Food World, Inc.,* 133 F.3d 1419, 1422 (11th Cir.1998). We also take note of the Court's warning that "the constitutional rights of children ... can neither be nullified openly and directly by [the] state ... nor nullified indirectly by [it] through evasive schemes ... whether attempted 'ingeniously or

---

[9]*See, e.g., Board of Educ. of Kiryas Joel v. Grumet,* 512 U.S. 687, 721, 114 S.Ct. 2481, 129 L.Ed.2d 546(1994) (O'Connor, J., concurring) ("the slide away from Lemon's unitary approach is well under way."); *Lee,* 505 U.S. at 587, 112 S.Ct. 2649 ("[w]e can decide the case without reconsidering the general constitutional framework by which public schools' efforts to accommodate religion are measured. Thus, we do not accept the invitation ... to reconsider our decision in Lemon v. Kurtzman."); *Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 655-56, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Kennedy, J., concurring in part and dissenting in part) (questioning the Court's continued adherence to the *Lemon* test); *Wallace v. Jaffree,* 472 U.S. 38, 112, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting) (stating that the *Lemon* test "has no basis in the history of the amendment it seeks to interpret, is difficult to apply and yields unprincipled results."); Kent Greenwald, *Quo Vadis: The Status and Prospects of "Tests" Under the Religion Clauses,* 1995 Sup.Ct. Rev. 323, 361 (1996) ("now that *Lemon* lacks *any* defenders on the Court, other judges would perform a shallow exercise were they to continue to apply its terms. They should recognize that the Supreme Court has definitely abandoned *Lemon.*").

ingenuously.' " *Gilmore v. City of Montgomery,* 417 U.S. 556, 568, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974) (quoting *Cooper v. Aaron,* 358 U.S. 1, 17, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958)).

B.      <u>Lee v. Weisman</u>

In *Lee v. Weisman,* the Court analyzed the policy of the public school system in Providence, Rhode Island, that permitted school principals to invite members of the clergy to offer invocation and benediction prayers at formal graduation ceremonies for middle and high schools. *See Lee,* 505 U.S. at 580, 112 S.Ct. 2649. In particular, the principal at Nathan Bishop Middle School invited a rabbi to offer the invocation and benediction at the school's graduation ceremony in 1989. The principal provided the rabbi with a pamphlet entitled "Guidelines for Civic Occasions" that the National Conference of Christians and Jews had prepared and advised the rabbi that the prayer should be nonsectarian. *See Lee,* 505 U.S. at 581, 112 S.Ct. 2649. The Court found that the school held the graduation on its premises, the students "enter as a group in a processional, subject to the direction of teachers and school officials, and sit together, apart from their families," and that the students "stood for the Pledge of Allegiance and remained standing during the rabbi's prayers." *Lee,* 505 U.S. at 583, 112 S.Ct. 2649.

The Court ruled that this policy of permitting prayer at public school graduation ceremonies was unconstitutional under the Establishment Clause, stating:

> These dominant facts mark and control the confines of our decision: State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools. Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma.

*Lee,* 505 U.S. at 586, 112 S.Ct. 2649. The high school principal's involvement in composing and directing a formal prayer exercise led the Court to hold the prayer "bore the imprint of the state" and to conclude that the state's involvement in the prayer created a "state-sponsored and state-directed religious exercise in a public school." *Lee,* 505 U.S. at 587, 590, 112 S.Ct. 2649. Thus, for purposes of our analysis under *Lee,* we shall

9

examine: (1) the state's control of the graduation ceremonies; and (2) the student's coerced participation in the graduation ceremonies.

### 1. State Control

The overriding issue in this case is whether the Duval County school system's policy, which allows graduating students to vote on the decision whether to have unrestricted opening and closing messages that students deliver at graduation ceremonies, effectively dissociates any prayer that may occur at the graduation ceremonies from the state's control. Although this case is distinguishable from *Lee,* where high school principals chose a member of the clergy to deliver a prayer, the fact that the entanglement is less obvious or intrusive does not save the school system's policy from a facial violation of the Establishment Clause.[10] Our review of *Lee* and cases from other circuits leads us to the conclusion that the delegation of the decision regarding a "prayer"or "message" to the vote of graduating students does not erase the imprint of the state from graduation prayer. Further, the Duval County school system developed this policy as an attempt to circumvent *Lee* and continue the practice of prayer, and to permit sectarian and proselytizing prayer, at graduation ceremonies.

The Duval County school system exerted tremendous control over the graduation ceremonies, in that the individual schools and the School Board: rented the facilities for the graduation; told the graduating students what they should wear; decided when the graduating students and audience could sit and stand; decided the sequence of events at the graduation; and designed and printed the program for the ceremonies. As the *Lee* Court observed, "[a]t a high school graduation, teachers and principals must and do retain a high

---

[10]In *Engel v. Vitale,* the Court spoke of less direct state control for Establishment Clause purposes:

> The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not.

370 U.S. 421, 430, 82 S.Ct. 1261 (1962).

10

degree of control over the precise contents of the program, the speeches, the timing, the movements, the dress, and the decorum of the students." *Lee,* 505 U.S. at 597, 112 S.Ct. 2649. The individual schools' decisions not to censor the messages that the elected students gave at the beginning and closing of the graduation ceremonies fails to erase the overwhelming control that the schools exerted over the remainder of the graduation ceremony. In fact, students decided whether to have a message at graduation and who to deliver that message "only because school officials agreed to let them decide that one question." *American Civil Liberties Union of New Jersey v. Black Horse Pike Reg'l Bd. of Educ.,* 84 F.3d 1471, 1479 (3d Cir.1996) (*en banc* ).

The Ninth Circuit in *Doe v. Madison Sch. Dist. No. 321* analyzed a school district's policy that permitted a school to invite four students, according to their academic class standing, to speak at their graduation ceremony, with the school administration barred from editing or censoring the students' remarks. *See* 147 F.3d 832, 834 (9th Cir.1998). The *Doe* court held that the policy was distinguishable from *Lee:*

> First, students—not clergy—deliver the presentations. Second, these student-speakers are selected by academic performance, a purely neutral and secular criterion. Third, once chosen, these individual students have autonomy over content; the school does not require the recitation of a prayer, but rather leaves it up to the student whether to deliver "an address, poem, reading, song, musical presentation, prayer, or any other pronouncement."

*Doe,* 147 F.3d at 835. The *Doe* court took note of Justice Souter's concurring opinion in *Lee,* that two other Justices had joined, which stated:

> If the State had chosen its graduation day speakers according to wholly secular criteria, and if one of those speakers (not a state actor) had individually chosen to deliver religious message, it would have been harder to attribute an endorsement of religion to the State.

> *Doe,* 147 F.3d at 835 (quoting *Lee,* 505 U.S. at 630 n. 8, 112 S.Ct. 2649 (Souter, J., concurring)).

The court held that this policy survived *Lee,* for "when a state uses a secular criteria for selecting graduating speakers and then permits the speaker to decide for herself what to say, the speech does not bear the imprimatur of the State." *Doe,* 147 F.3d at 836.

We find *Doe* to be distinguishable on two points. The *Doe* court relied on the neutral selection of student speakers on the basis of their academic standing and the school's policy to permit those speakers to make a private choice about what to say. *See Doe,* 147 F.3d at 835 n. 5 (emphasizing the private character of any decision to pray or speak on religious topics through the graduation program's printed disclaimer). This reasoning merely recognizes what the Court has made clear: "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Board of Educ. of Westside Community Sch. v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion). What the *Doe* court did not decide, however, is the following question:

> Can school boards allow students to decide by majority vote to have religious exercises at graduation? Such practice, as one commentator explained, creates a "danger that a majority will bring intimidating pressures to bear in favor of a particular religion," a danger that is not present when a school chooses a speaker through a neutral method and allows her to speak freely.

*Doe,* 147 F.3d at 836 n. 7 (quoting *Recent Case,* 110 Harv. L.Rev. 781, 783 (1997)) (internal citations omitted). The Duval County policy permits graduating students to decide through majority/plurality vote whether a student volunteer shall give a message. Another distinguishing point is that the Duval County school system's policy restricts these messages to no longer than two minutes at the beginning and closing of the graduation ceremony. The *Doe* policy does not reveal the sequence in which the four speakers spoke, but indicates that each of the four speakers spoke under the same circumstances. *See Doe v. Madison Sch. Dist. No. 321,* 7 F.Supp.2d 1110, 1112 (D.Idaho 1997), *aff'd,* 147 F.3d 832 (9th Cir.1998). The Duval County school system's policy thus exerts more control over the student speakers.

The Third Circuit *en banc* in *Black Horse Pike* considered a policy that permitted students to vote on the direct question of whether to have prayer at their graduation ceremonies, and held that such a policy violated the Establishment Clause. 84 F.3d at 1477-88.[11] The *Black Horse Pike* court took particular offense

---

[11]The policy, in pertinent part, allowed for prayer under the following conditions:

to the requirement "to have us recognize a right in that plurality to [permit verbal prayer at graduation ceremonies], and ignore the right of others to worship in a different manner, or in no manner at all." *Black Horse Pike,* 84 F.3d at 1477. Instead, the *Black Horse Pike* court held that "[a]n impermissible practice can not be transformed into a constitutionally acceptable one by putting a democratic process to an improper use." *Black Horse Pike,* 84 F.3d at 1477; *see also Board of Educ. of Kiryas Joel,* 512 U.S. at 698-700, 114 S.Ct. 2481 (holding that the state cannot transform a practice that tends to establish religion into a secular one through delegating some aspect of the practice to non-governmental actors); *Harris v. Joint Sch. Dist. No. 241,* 41 F.3d 447, 455 (9th Cir.1994) ("elected officials cannot absolve themselves of a constitutional duty by delegating their responsibilities to a nongovernmental entity."), *vacated as moot,* 515 U.S. 1155, 115 S.Ct. 2604, 132 L.Ed.2d 849 (1995). As the *Lee* court stated, "[w]hile in some societies the wishes of the majority might prevail, the Establishment Clause of the First Amendment is addressed to this contingency and rejects the balance urged upon us." *Lee,* 505 U.S. at 596, 112 S.Ct. 2649.

Although the policy that the *Black Horse Pike* court analyzed is distinguishable because the students voted on the direct question of prayer, its analysis of the policy's attempt to dissociate prayer from the state's imprint is persuasive. When we analyze the Duval County school system's policy, we find evidence of the policy's intent to permit prayer: (1) Reynolds and Superintendent Zenke originally instructed all schools to stop directing prayer at graduation ceremonies under *Lee,* and devised the current policy after pressure to develop a way to circumvent *Lee* 's prohibition of school-sponsored prayer at graduation ceremonies; (2) they entitled the memorandum embodying the policy "Graduation Prayers"; (3) the School Board voted down a moment of silence to permit these guidelines to remain in place; and (4) unlike a valedictory address, a

---

1. The Board of Education, administration and staff of the schools shall not endorse, organize or in any way promote prayers at school functions.

2. In the spirit of protected speech, the pupils in attendance must choose to have prayer conducted. Such prayer must be performed by a student volunteer and may not be conducted by a member of the clergy or staff.

*Black Horse Pike,* 84 F.3d at 1475.

13

two-minute "message" at the beginning or end of a graduation ceremony is more likely to result in prayer.[12]

Thus, we find that the school system believed it could give a "wink and a nod" to controlling Establishment Clause jurisprudence through attempting to delegate to the majority/plurality vote of students what it could not do on its own—permit and sponsor sectarian and proselytizing prayer at graduation ceremonies. The Establishment Clause simply does not allow this. As the Court stated in *West Virginia State Board of Educ. v. Barnette,*

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's ... fundamental rights may not be submitted to vote; they depend on the outcome of no election.

319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

We also consider these students state actors for Establishment Clause purposes. In *Evans v. Newton,* the Court held that the line between private and state action "is not always easy to determine" and that "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed on state action." 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). The *Evans* Court also explained that when the state permits private groups or individuals to exercise governmental functions, the group or individual then must be subject to constitutional limits. *See Evans,* 382 U.S. at 299, 86 S.Ct. 486; *see also Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (holding that when the state is a joint participant in the activity, the activity "cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment"); *Harris,* 41 F.3d at 455 ("[w]hen the senior class is given plenary power over a state-sponsored, state-controlled event such as a high school graduation, it is just as constrained by the Constitution as the state would be."). Accordingly, even the elected student speaker's independent

---

[12]The *Adler I* court realized that messages at the opening and closing of a graduation ceremony would likely lead to prayer when it stated that "[i]nvocations and benedictions have been traditional and are therefore familiar if not expected at high school graduation ceremonies." *Adler I,* 851 F.Supp. at 453 n. 9.

14

choice of a topic is a choice fairly attributable to the state and, just as a publically-elected school board president could not make a "private decision" to lead the public schools in a recitation of a prayer every morning, neither may the senior class's elected representative make a private decision to do the same thing from the graduation podium. *See, e.g., Berger v. Rensselaer Cent. Sch. Corp.,* 982 F.2d 1160, 1167 (7th Cir.) ("[i]magine that the Gideons came to ... schools ... every morning to lead students in prayer. Is there any doubt that such morning prayers would be impermissible ... no matter that the prayers were led by non-school employees?") (internal citations omitted), *cert. denied,* 508 U.S. 911, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993).

We also find the reliance of the district court and the Duval County school system upon the Fifth Circuit's reasoning in *Jones v. Clear Creek Indep. School Dist.* to be unpersuasive. *See Adler I,* 851 F.Supp. at 456. The policy in *Jones* is similar to the one at bar, with the primary difference being that the *Jones* guidelines instructed that the invocation and benediction "shall be nonsectarian and nonproselytizing." *See Jones v. Clear Creek Indep. Sch. Dist.,* 930 F.2d 416, 417 (5th Cir.1991), *vacated,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992).[13] The *Jones* court held that the policy "does not unconstitutionally endorse religion if it submits the decision of graduation invocation content, if any, to the majority vote of the senior class." *Jones,* 977 F.2d at 969. The court premised its holding on the idea that "a graduating high school senior *who participates in the decision as to whether her graduation will include an invocation by a fellow student volunteer* will understand that any religious references are the result of student, not government, choice." *Jones,* 977 F.2d at 969. The district court in *Adler I* followed this reasoning, stating that "the participants clearly understand that the student messages are just that—student messages that are divorced entirely from any governmental or institutional sponsorship." *Adler I,* 851 F.Supp. at 456. We disagree.

---

[13]The other major differences between the two policies are that: (1) the *Jones* policy referred to "invocations" and "benedictions," while the Duval County policy referred to "opening and closing messages"; and (2) the senior class principal in *Jones* had the power to advise and counsel the senior class. *Jones,* 930 F.2d at 417.

Based on our analysis above, the state cannot erase its control over or endorsement of prayer at a public school graduation through delegation of one portion of the graduation ceremony to the majority/plurality vote of students. Further, we believe (as we shall discuss further in the "coerced participation" factor) that a reasonable student will not realize that student-elected sectarian and proselytizing prayerful messages at graduation ceremonies are divorced from state sponsorship and instead, realizing the views to be that of the majority, will feel coerced to participate in them.

Additionally, the Fifth Circuit clarified its Establishment Clause jurisprudence in *Doe v. Santa Fe Indep. Sch. Dist.,* in which it held that a *Jones* graduation policy that did not contain the limitation that invocations and benedictions be nonsectarian and nonproselytizing violated the Establishment Clause. *See Santa Fe,* 168 F.3d 806, 816-17 (5th Cir.1999).[14] The court held that *Jones* "did not hold that a policy is insulated from constitutional scrutiny under the Establishment Clause merely because it permits, rather than requires, religious speech when selected and given by students," and that the content restrictions were "central" to *Jones*'s holding. *Santa Fe,* 168 F.3d at 816-17. Although the *Santa Fe* court bypassed a formal *Lee* analysis, it held that

> when the school "permits" sectarian and proselytizing prayers—which, by definition, are designed to reflect, and even convert others to, a particular religious viewpoint and which ... do not serve (and even run counter to) the permissible secular purpose of solemnizing an event—such "permission" undoubtedly conveys a message not only that the government endorses religion, but that it endorses a particular form of religion.

---

[14]The *Santa Fe* court also held that a policy of prayer at high school football games also violated the Establishment Clause. *See Santa Fe,* 168 F.3d at 811-12. The graduation ceremony policy that the court reviewed is as follows:

> The board has chosen to permit the graduating senior class, with the advice and counsel of the senior class principal or designee, to elect by secret ballot to choose whether an invocation and benediction shall be a part of the graduation exercise. If so chosen, the class shall elect by secret ballot, from a list of student volunteers, students to deliver invocations and benedictions for the purpose of solemnizing their graduation ceremonies.

*See Santa Fe*, 168 F.3d at 811-12. The policy also had a "fallback," which provided that if a court enjoins the school district from enforcing the policy, then it would utilize the nonsectarian and nonproseltyzing limitation. *See Santa Fe,* 168 F.3d at 812.

16

*Santa Fe,* 168 F.3d at 817-18. As the Duval County school system's policy in fact "permits" sectarian and proselytizing prayers, it is therefore distinguishable from *Jones* and fits within *Santa Fe* 's holding. Further, *Santa Fe* holds that a school's delegation to students the decision whether to have some type of "message" at a graduation ceremony does not insulate the school from constitutional scrutiny.

We hold that the state's control over nearly all aspects of the graduation ceremony, and the choices of a student-elected representative, subjects the ceremony to the limits of the Constitution. We further hold that this policy does not dissociate student-initiated sectarian and proselytizing prayer at a school-controlled graduation ceremony from the imprint of the state under *Lee,* and that the state's endorsement of the prayer subjects it to a facial violation of the Establishment Clause. Accordingly, we hold that the control that the Duval County school system exercised is sufficient to satisfy the state control "dominant fact" under *Lee.*

### 2. Coerced Participation

The second "dominant fact" under *Lee* is an easier issue. "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise...." *Lee,* 505 U.S. at 587, 112 S.Ct. 2649. The *Lee* Court discussed coerced participation at a graduation ceremony as follows:

> The undeniable fact is that the school district's supervision and control of a high school graduation ceremony places public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the invocation and benediction. This pressure, though subtle and indirect, can be as real as any overt compulsion.... But for the dissenter of high school age, who has a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow, the injury is not less real.

*Lee,* 505 U.S. at 593, 112 S.Ct. 2649. Because a student's attendance at his or her graduation ceremony is "in a fair and real sense obligatory," the *Lee* court held that students "had no real alternative which would have allowed [them] to avoid the fact or appearance of participation [in prayer]." *Lee,* 505 U.S. at 586, 588, 112 S.Ct. 2649. Additionally, "[t]he prayer exercises ... are especially improper because the State has in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular

17

importance to every student, one the objecting student had no real alternative to avoid." *Lee,* 505 U.S. at 598, 112 S.Ct. 2649.

The Duval County school system's graduation policy, and the school's control over the graduation ceremony, require students to remain silent and perhaps even stand for the duration of the message. Thus, because the school system devised this system so that prayer could occur at graduation ceremonies, this coerced participation violates the Establishment Clause. The Court stated in *Engel* that "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Engel,* 370 U.S. at 431, 82 S.Ct. 1261. Further, because the graduation speaker under the Duval County school system's policy won an elective contest to speak, the audience is much more aware that the views expressed are those of the majority and, according to *Lee,* the audience faces even greater compulsion to participate. *See, e.g., Black Horse Pike,* 84 F.3d at 1481 ("[the First Amendment] is not a sword that can be used to compel others to join in a religious observance at a state sponsored event."). The *Lee* Court emphasized the importance of graduation as a "once-in-a-lifetime" event and that "[t]he Constitution forbids the State to exact religious conformity from a student as the price of attending her own high school graduation." *Lee,* 505 U.S. at 596, 112 S.Ct. 2649. Thus, we hold that the Duval County school system's policy coerces objecting students to participate in prayer, thereby satisfying *Lee* 's coerced participation "dominant fact."

C.      *Lemon v. Kurtzman*

We next analyze the Duval County school system's policy under the three-prong *Lemon* test. Under *Lemon,* we must ask whether: (1) the Duval County school system had a secular purpose for adopting the policy; (2) the policy's primary effect is one that neither advances nor inhibits religion; and (3) the policy does not result in an excessive entanglement of government with religion. *See Lemon,* 403 U.S. at 612-13, 91 S.Ct. 2105. The Duval County school system's policy violates the Establishment Clause if it fails to meet any of these criteria. *See Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

18

*1. Secular Purpose*

The first prong of the *Lemon* test requires us to determine whether the challenged policy has a "clearly secular purpose." *Wallace,* 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). We must ask "whether [the] government's actual purpose is to endorse or disapprove of religion." *Wallace,* 472 U.S. at 56, 105 S.Ct. 2479 (internal quotations omitted); *see also Lynch v. Donnelly,* 465 U.S. 668, 690-91, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) ("[secular purpose] is not satisfied, however, by the mere existence of some secular purpose, however dominated by religious purposes."); *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater,* 2 F.3d 1514, 1527 (11th Cir.1993) ("no legislative recitation of a supposed secular purpose can blind us to an enactment's pre-eminent purpose.") (internal quotations and citations omitted), *cert. denied,* 513 U.S. 807, 115 S.Ct. 54, 130 L.Ed.2d 13 (1994). Although the policy's purpose need not be exclusively secular, it must be sincere and not a sham. *Edwards,* 482 U.S. at 586-87, 107 S.Ct. 2573.

The appellants presented the following evidence to show that the Duval County school system's policy did not have a clearly secular purpose: (1) the Duval County school system drafted this policy in response to community support for prayer at graduation ceremonies and as an attempt to "fish" for ways around *Lee;* (2) Reynolds entitled the memorandum that enunciated this policy "Graduation Prayer"; and (3) the comments of the School Board members evidence their intent that instead of a moment of silence, the individual schools should adopt the policy to permit graduating students to engage in prayer. In *Jager v. Douglas County Sch. Dist.,* this court held that a policy that permits religious invocations at public high school football games "by definition serve[s] religious purposes" and therefore does not have a secular purpose. *See* 862 F.2d 824, 829-30 (11th Cir.), *cert. denied,* 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989). The *Jager* decision dictates that when a public school policy's actual purpose is religious—even intrinsically religious—the policy violates the secular purpose requirement under *Lemon. See Jager,* 862 F.2d at 830 (discussing cases that conclude that "an intrinsically religious practice cannot meet the secular purpose prong of the *Lemon* test").

The district court erred in failing to follow *Jager. See Adler I,* 851 F.Supp. at 452 n. 8 (questioning the value of *Jager* ). We hold that the policy, both on its face and based upon the history surrounding its inception, has an actual purpose to permit prayer—including sectarian and proselytizing prayer—at graduation ceremonies. *See Santa Fe,* 168 F.3d at 817 (holding that a policy that permits sectarian and proselytizing prayers has "a purpose which is the antithesis of secular."). In fact, prayers were the direct consequence of this policy, as the Duval County school system's 1992 policy—that directly outlawed prayer—would have banned them. *See Black Horse Pike,* 84 F.3d at 1479-80 ("[t]he text of [the policy] was adopted in response to *Lee.* The Board's avowed purpose in reexamining its policy was to provide an option that might allow the 'longstanding tradition' of graduation prayer to survive the prohibitions of that Supreme Court decision."). Thus, the policy violates the secular purpose requirement under *Lemon. See Jaffree v. Wallace,* 705 F.2d 1526, 1534 (11th Cir.1983) ("[r]ecognizing that prayer is the quintessential religious practice implies that no secular purpose can be satisfied."), *aff'd,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

We also take exception with the district court's conclusion that graduation ceremonies are "designated, limited public fora." *Adler I,* 851 F.Supp. at 454. The district court held that

> [t]raditionally, the ceremonies are held at the coliseum, away from the school campuses, and virtually the entire program is given over to public speech making by the valedictorian and other leaders of the graduating class, and by community leaders who are invited to give the principal commencement address.

*Adler I,* 851 F.Supp. at 454. We agree with the *Black Horse Pike* court that "[h]igh school graduation ceremonies have not been regarded, either by law or tradition, as public fora where a multiplicity of views on any given topic, secular or religious, can be expressed and exchanged." *Black Horse Pike,* 84 F.3d at 1478; *see also Doe,* 147 F.3d at 838 ("the graduation ceremony is not a public forum"). The individual schools exert great control over the graduation ceremonies and the policy did not broaden the right of students to speak at the graduation ceremonies. Instead, only students that the majority selected could give a brief opening and closing message. "No matter what message a minority of students may wish to convey, the

20

graduation forum is closed to them." *Harris,* 41 F.3d at 457. Because the graduation ceremony is not a public forum, we hold that the district court's reliance on public forum cases—and their corresponding requirement of strict scrutiny review—is incorrect.[15]

### 2. Primary Effect

Even if we assume that the Duval County school system's policy survives the first *Lemon* prong, we also hold that the policy is facially unconstitutional because it fails the primary effect prong. The primary effect prong requires us to ask "whether, irrespective of [the] government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval [of religion]." *Wallace,* 472 U.S. at 56 n. 42, 105 S.Ct. 2479 (quoting *Lynch,* 465 U.S. at 690, 104 S.Ct. 1355). We must use the viewpoint of the "reasonable observer" to determine if the principal or primary effect of the policy is one "that neither advances nor inhibits religion." *Lemon,* 403 U.S. at 612, 91 S.Ct. 2105. In undertaking this analysis, we must

---

[15]The *Adler I* court relied upon *Chabad-Lubavitch,* a case in which the *en banc* court reversed the denial of a group's request to erect a menorah in the Rotunda of Georgia's Capitol Building. *See Chabad-Lubavitch,* 5 F.3d at 1385-86. The court specifically found that "[o]ver the past decade, Georgia has opened the Rotunda to Georgia's citizenry for their expressive activities both secular and religious in nature." *Chabad-Lubavitch,* 5 F.3d at 1386. The *Chabad-Lubavitch* court was careful to distinguish itself from *Jager,* because "*Jager* involved state-sponsored religious speech in a non-public forum; quite different from the private religious speech in a public forum in the instant case." *Chabad-Lubavitch,* 5 F.3d at 1393 n. 16. A high school graduation ceremony is not "open" to its participants for expressive activity, and the policy's permitting two elected student representatives to give a message does not transform the graduation ceremony into a designated public forum. *See also Arkansas Educ. Television Comm. v. Forbes,* 523 U.S. 666, 118 S.Ct. 1633, 1642, 140 L.Ed.2d 875 (1998) ("[a] designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers."). We also hold that a public school graduation ceremony is not a "limited public forum," because limited public forums "are those areas that the government has created for use by the public as places for expressive activity." *Gay Lesbian Bisexual Alliance v. Pryor,* 110 F.3d 1543, 1548 (11th Cir.1997) (citing *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)); *see also Santa Fe,* 168 F.3d at 821 ("even though the government may designate a forum only for particular speakers or for the discussion of particular topics ... [the school district's] restrictions so shrink the pool of potential speakers and topics that the graduation ceremony cannot possibly be characterized as a public forum—limited or otherwise—at least not with fingers crossed or tongue in cheek."). The Duval County school system did not establish its graduation ceremonies for public use; instead, it chose all of the speakers except the elected student(s).

21

also be mindful that this consideration is especially important in the context of public schoolchildren. *See Edwards,* 482 U.S. at 583-84, 107 S.Ct. 2573.

The primary effect of the Duval County school system policy is to permit prayer at graduation ceremonies. Before 1992, schools in Duval County coordinated prayer at graduation ceremonies. After *Lee,* Superintendent Zenke and Reynolds instructed schools no longer to permit prayer at their graduation ceremonies. After pressure from the community and the Fifth Circuit's *Jones* decision, Superintendent Zenke and Reynolds released a memorandum entitled "Graduation Prayer" that permitted students to decide through majority/plurality vote whether to have student-led "messages" at the beginning and closing of graduation ceremonies. In 1992, 10 of the 17 graduation ceremonies had student prayer. A reasonable observer at a graduation ceremony would believe that the "Graduation Prayer" policy conveys an endorsement of prayer—as the schools in the Duval County school system did openly prior to 1992—which advances religion. *See Jaffree,* 705 F.2d at 1534-35 ("[t]he primary effect of prayer is the advancement of one's religious beliefs."); *Santa Fe,* 168 F.3d at 818-19 (holding that school's permitting sectarian and proselytizing prayers "undoubtedly conveys a message not only that the government endorses religion, but that it endorses a particular form of religion."). Further, the policy can place those attending graduation ceremonies "in the position of participating in a group prayer," which also violates the primary effect prong of *Lemon. See Jager,* 862 F.2d at 831.

### 3. Entanglement

Because the policy clearly fails the first two prongs of *Lemon,* we need not engage in an analysis of *Lemon* 's third "entanglement" prong.

### V. CONCLUSION

Based on the foregoing, we hold that the Duval County school system's policy of permitting graduating students to decide, through majority/plurality vote, whether to have student representatives give unrestricted messages at the beginning and closing of graduation ceremonies facially violates the

22

Establishment Clause under *Lee* and *Lemon*. Therefore, we reverse the district court's judgment in favor of appellees, and we remand this case so that: (1) appellants can pursue discovery on the events at graduations after 1993 for their as-applied challenge and damages; (2) the district court may consider the motions of intervenors; and (3) the district court may undertake further proceedings consistent with this opinion.[16]

REVERSED and REMANDED.

KRAVITCH, Senior Circuit Judge, Specially Concurring:

I concur in both the reasoning and result of the majority opinion; on its face, the policy of the Duval County School Board violates the Establishment Clause of the First Amendment as the Supreme Court has interpreted it in both *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) and *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Contrary to the dissent's characterizations, the grounds of the majority opinion are quite narrow, and I write separately only to emphasize the particular points that I believe dictate the outcome of today's decision.

I.     *Lee v. Weisman*

As the majority opinion succinctly observes, the Supreme Court rested its decision in *Lee* on two "dominant facts": (1) "[s]tate officials direct[ed] the performance of a formal religious exercise" and (2) even for objecting students "attendance and participation in the state-sponsored religious activity [were] in a fair and real sense obligatory...." *Lee,* 505 U.S. at 586, 112 S.Ct. at 2655. In *Lee,* a high school principal decided to include a prayer at graduation, selected a local rabbi to deliver the prayer, and instructed the rabbi that the prayer be nonsectarian, giving him a copy of "Guidelines for Civic Occasions" to assist him in choosing

---

[16]For purposes of the appellants' as-applied challenge on remand, we direct the district court to consider, along with newly-discovered evidence, the record evidence of school-directed prayer at graduation ceremonies. The limited record shows that many of the programs from school graduations indicate that "chaplains" gave "invocations" and "benedictions" during which the graduation programs directed the audience to stand. Additional record evidence shows that speakers at some of the graduation exercises were not selected using wholly secular criteria and students voted directly on the question of whether to have prayer at graduation ceremonies. In some instance, a faculty member delivered a prayer. Evidence of this sort clearly violates *Lee*.

appropriate material. *Id.* at 581, 112 S.Ct. at 2652. It was this unabashed state involvement in composing and directing a formal prayer exercise that led the Court to find that the prayer "bore the imprint of the State," *id.* at 590, 112 S.Ct. at 2657, and to conclude that the principal's practice created a "state-sponsored and state-directed religious exercise in a public school," *id.* at 581, 112 S.Ct. at 2655. As the *Lee* Court held that the prayer, delivered from the podium during the graduation ceremony, constituted a formal religious exercise, the difficult question in the present case is whether a student speaker's decision to pray under similar circumstances is attributable to the state.

Under most circumstances, the Establishment Clause presents no obstacle to a student's decision to pray on school premises or during a school event. Contrary to popular belief, the courts never have interpreted the Establishment Clause to prohibit any individual student from praying, for example, before a meal or before a test.[1] The dissent suggests that the majority comes "perilously close" to adopting such a course of action in the context of public high school graduations, Dissent at 2442, but this case presents no occasion to rewrite settled Establishment Clause jurisprudence, and today's decision neither aspires to nor achieves that result.[2] The majority opinion acknowledges that, under some circumstances, a student's individual decision to pray from the podium at a high school graduation *may* be constitutional. *Cf. Doe v. Madison Sch. Dist. No. 321,* 147 F.3d 832 (9th Cir.1998) (upholding a policy that permitted the top four students to speak on any topic of their choosing without state approval), *withdrawn & reh'g granted,* 165 F.3d

---

[1]*See generally* Daniel N. McPherson, *Student-Initiated Religious Expression in the Public Schools: The Need for a Wider Opening in the Schoolhouse Gate,* 30 Creighton L.Rev. 393 (1997) (discussing "flagpole prayer" where students spontaneously congregate to pray).

[2]In particular, I object to the dissent's contention that the majority opinion would outlaw all private religious expression at a graduation, *see* Dissent at 2442, and the suggestion that our decision prevents a speaker from discussing religious themes or thoughts, *id.* at 9, 31- 32 & n. 8. Our decision today, as the Supreme Court's decision in *Lee,* concerns prayer—a formal religious exercise—delivered at the state's direction from the podium at a high school graduation. *See Lee,* 505 U.S. at 586 & 589, 112 S.Ct. at 2655 & 2656 (describing prayer as a formal religious exercise); *Jager v. Douglas County Sch. Dist.,* 862 F.2d 824, 830 (11th Cir.1989) (explaining that prayer is the quintessential religious practice). I find nothing in the majority opinion that supports the dissent's concerns regarding such extreme further implications or consequences.

24

1265 (9th Cir. Mar.19, 1999).[3] As the parties to this case have emphasized, the Establishment Clause applies only to the federal and state governments and has no effect on prayer that *genuinely* is private in character. The majority opinion recounts—in convincing detail—why the Duval County School Board's policy produces speech of a public rather than private character, and I will not repeat that analysis here.[4]

I acknowledge that the Fifth Circuit's decision in *Jones v. Clear Creek Indep. Sch. Dist.,* 977 F.2d 963 (5th Cir.1992), which holds that "a majority of students can do what the State acting on its own cannot do to incorporate prayer in public high school graduation ceremonies," is at odds with the reasoning of our opinion today. *Id.* at 972. In my view, the *Jones* decision to uphold a student vote to include prayer at a high school graduation, and in particular the specific language quoted above, strains the boundaries of *Lee* and conflicts with the Supreme Court's decision in *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 1185-86, 87 L.Ed. 1628 (1943) (explaining that the protections of the Bill of Rights are not subject to waiver on the basis of a majority vote). Moreover, to the extent *Lee* requires us to evaluate considerations of psychological coercion, it seems to me that a prayer from the lips of a popularly elected student representative is far more likely to coerce audience participation than one from a member of the clergy selected by the school principal.

II.     The Continuing Relevance of *Lemon v. Kurtzman*

Although the Supreme Court's *Lemon* decision has been the target of much academic and judicial criticism, *Lemon* remains the law of the land and of this circuit. *See* Maj. Op. at 2426 (citing *Lamb's Chapel*

---

[3]We need not decide today whether the now-vacated *Madison* decision was correct or even persuasive. Nor must we conjure up a host of hypothetical circumstances under which the *Madison* panel's reasoning would be more or less convincing. Today's opinion properly limits the scope of our decision to the circumstances of the policy presently under review.

[4]Although the policy sets forth secular criteria for selecting speakers, even the limited record presently available includes disturbing allegations and evidence that the speakers who addressed the audience at graduation ceremonies pursuant to the policy were not selected according to wholly secular criteria and, in at least one case, was not a student but a member of the faculty. As the majority opinion observes, conduct of that nature plainly falls within the Supreme Court's proscriptions in *Lee.*

*v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 395 n. 7, 113 S.Ct. 2141, 2148 n. 7, 124 L.Ed.2d

352 (1993);  *Chabad-Lubavitch v. Miller,* 5 F.3d 1383, 1388 & n. 8 (11th Cir.1993)).[5]  Notwithstanding

*Lemon* 's continued vitality as part of our general Establishment Clause jurisprudence, it is not immediately

obvious that we still should apply *Lemon* 's analysis, *in addition* to the more specifically applicable analysis

in *Lee,* in cases that involve prayer at high school graduations.  Upon examination, however, I am convinced

that *Lemon* remains binding law even in this particular area.[6]

Beginning with the Supreme Court's four opinions in *Lee,* I note that the only opinion that declares

the *Lemon* test irrelevant to the issues at hand is that of the dissent.[7]  *See Lee,* 505 U.S. at 644, 112 S.Ct. at

2685 (Scalia, J., dissenting).  Although Justice Kennedy's majority opinion recounts the analysis of the district

and circuit courts, both of which declared the policy in question unconstitutional under the *Lemon* test, the

---

[5]The Supreme Court has continued to apply *Lemon* by name and did so as recently as two terms ago. *See Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 2015, 138 L.Ed.2d 391 (1997).  Following the Court's lead, we also have continued to apply the *Lemon* test in Establishment Clause cases.  *See Bown v. Gwinnett County Sch. Dist.,* 112 F.3d 1464, 1468 (11th Cir.1997).

[6]As the majority explains, to survive scrutiny under the *Lemon* test, the challenged policy must:  (1) have a secular purpose;  (2) have a principal or primary effect that neither advances nor inhibits religion; and (3) not foster excessive government entanglement with religion.  *See Lemon,* 403 U.S. at 612-13, 91 S.Ct. at 2111 (1971).

[7]Two of these same dissenters (Justices Scalia and Thomas), as well as Justice Kennedy, expressed concern about the Court's opinion in *Lamb's Chapel,* joined by two of the *Lee* dissenters (Justices Rehnquist and White), which "resurrected" *Lemon.  See Lamb's Chapel,* 508 U.S. at 395 & n. 7, 113 S.Ct. at 2148 & n. 7 (applying *Lemon* and adding that the Court has not overruled the case);  *id.* at 397, 113 S.Ct. at 2149 (Kennedy, J., concurring in judgment) (calling the majority's citation of *Lemon* "unsettling and unnecessary");  *id.* at 398, 113 S.Ct. at 2149 (Scalia, J., dissenting) (likening *Lemon* to a "ghoul in a late-night horror movie that repeatedly sits up in its grave ... after being repeatedly killed and buried"). More significantly, Justice Scalia subsequently has conceded error in his eulogy for *Lemon* and has observed (albeit with considerable dismay) that, despite the Court's recent fondness for deciding Establishment Clause cases without reference to *Lemon,* the lower courts are not free to ignore the case because they may not discard Supreme Court precedent at will.  *See Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet,* 512 U.S. 687, 750-51, 114 S.Ct. 2481, 2515, 129 L.Ed.2d 546 (1994) (Scalia, J., dissenting).

opinion pointedly sidesteps *Lemon.*[8] Rather than accepting the invitation of both the petitioning school principal and the Solicitor General to overrule or modify *Lemon,* the majority declared that it need not address the case because the state involvement in the prayer and coercion present in *Lee* made it an easy case that the Court could "decide without reconsidering the general constitutional framework by which public schools' efforts to accommodate religion are measured." *Lee,* 505 U.S. at 587, 112 S.Ct. at 2655. By suggesting that the Establishment Clause problems implicated in the practice at issue in *Lee* were so obvious as to compel the result, the majority opinion seems to require (or at least permit) courts to apply the general *Lemon* framework in more difficult cases in which the state's involvement and coercion are not as plain.

Indeed, every court that has addressed the issue of prayer at graduation since *Lee* has assumed this conclusion and has applied *both* the *Lee* and *Lemon* analyses. In *Jones v. Clear Creek Indep. Sch. Dist.,* a case the Supreme Court remanded in light of *Lee,* for example, the Fifth Circuit decided that a full reconsideration of the case required the court to apply the three-pronged test of *Lemon* in addition to considering the implications of *Lee. See* 977 F.2d 963, 966 & n. 8 (5th Cir.1992) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984) for the proposition that the Court is " 'unwilling to be confined to any single test or criterion in this sensitive area' ") (internal punctuation omitted).[9] The Third Circuit, writing *en banc,* took a more forceful view of the question and specifically stated that because *Lemon* was still good law the court was bound to apply it despite its conspicuous absence from the *Lee* analysis. *See ACLU v. Black Horse Pike Reg. Bd. of Educ.,* 84 F.3d 1471, 1484 (3d Cir.1996) (*en banc*

---

[8]Justice Blackmun's concurring opinion traces the evolution of the Court's Establishment Clause case law, including the development of the *Lemon* test, and declares that nothing in the majority opinion conflicts with the established jurisprudence. *See Lee,* 505 U.S. at 600-04, 112 S.Ct. at 2662-64 (Blackmun, J., concurring). Justice Souter's concurrence also cites *Lemon* with approval but does not address the continued viability of the test. *Id.* at 627, 112 S.Ct. at 2676 (Souter, J., concurring). Justices Stevens and O'Connor joined both concurrences.

[9]The Fifth Circuit reaffirmed the continued applicability and relevance of the *Lemon* test in school prayer cases, in addition to the analysis in *Lee,* in *Ingebretsen v. Jackson Public School Dist.,* 88 F.3d 274, 278-79 (5th Cir.1996), in *Doe v. Duncanville Indep. School Dist.,* 70 F.3d 402 (5th Cir.1995), and again in *Doe v. Santa Fe Indep. Sch. Dist.,* 168 F.3d 806 (5th Cir.1999).

). Even the *Black Horse Pike* dissenters agreed that deference to precedent required the court to apply *Lemon* in addition to *Lee. Id.* at 1493 (Mansmann, J., dissenting). The Ninth and Seventh Circuits also have assumed, without discussion, that the *Lemon* test continues to apply to graduation prayer cases and have applied *Lemon* in addition to *Lee. See Doe v. Madison Sch. Dist. No. 321,* 147 F.3d 832, 836-38 (9th Cir.1998), *withdrawn & reh'g granted,* 165 F.3d 1265 (9th Cir.1999); *Harris v. Joint Sch. Dist. No. 241,* 41 F.3d 447, 457-58 (9th Cir.), *vacated as moot,* 515 U.S. 1154, 115 S.Ct. 2604, 132 L.Ed.2d 849 (1995); *id.* at 460 n. 4 (Wright, J., dissenting) (disagreeing with the result but noting the applicability of the *Lemon* test); *Tanford v. Brand,* 104 F.3d 982, 986 (7th Cir.1997) (applying *Lemon* in addition to *Lee* in a challenge to prayer at a university graduation). Similarly, the district court in this case applied both *Lemon* and *Lee. See Adler v. Duval County Sch. Bd.,* 851 F.Supp. 446, 450-51 (M.D.Fla.1994) ("*Adler I* "). In short, although some courts and individual judges have disagreed over what manner of prayer the Supreme Court's precedents might permit at a public graduation, to our knowledge *no court* nor *single judge* has published an opinion that even suggests that *Lemon* is no longer applicable to cases involving graduation prayer or that *Lee* presents the only acceptable or relevant analysis.

Finally, even were we to accept *arguendo* the dissent's suggestion that the *Lemon* test is inapplicable to cases involving prayer at high school graduation and "unnecessary" to evaluate Duval County's policy, Dissent at 2444-45, no authority suggests that we may ignore the underlying principles of *Lemon,* developed in cases both before and after the Supreme Court decided that case.[10] In 1947, almost 25 years before *Lemon,* the Supreme Court explained that the Establishment Clause "means at least" that the state can neither "force nor influence" its citizens to attend or refrain from attending any church. *Everson v. Board of Educ.,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). Indeed, the Supreme Court's holding in *Lee* easily could be

---

[10]*See, e.g.,* Kent Greenawalt, *Quo Vadis: The Status and Prospects of "Tests" Under the Religion Clauses,* 1995 Sup.Ct. Rev. 323, 361 ("What courts and lawyers should do instead [of applying *Lemon* ] is focus on narrower principles relevant for particular circumstances, drawing these principles partly from the very Supreme Court cases decided under the *Lemon* test.")

read as nothing more than a reaffirmation of that narrow principle: the state may not coerce (or, more controversially, encourage) its citizens to participate in formal religious exercises.

Similarly, in a case decided three years before *Lemon,* the Supreme Court relied on the state's religious purpose in enacting a statute to strike down a state law that criminalized the teaching of evolution in public schools. *See Epperson v. Arkansas,* 393 U.S. 97, 107-09 & n. 16, 89 S.Ct. 266, 272-73 & n. 16, 21 L.Ed.2d 228 (1968) (quoting a campaign advertisement that supported the statute). Although the state's motivation, "to suppress the teaching of a theory which, it was thought, 'denied' the divine creation of man," *id.* at 109, 89 S.Ct. at 273, was more extreme than the school board's purpose here, the difference is one only of degree; both practices violate the broader principle that the state may not act with the primary purpose of advancing religion.

The Supreme Court repeatedly has reaffirmed this principle in the years since *Lemon* by applying it in the context of that framework. In *Stone v. Graham,* for example, the Court rejected the Kentucky state legislature's "avowed" secular purpose for posting the Ten Commandments in public schools and declared the practice unconstitutional because it found that the state's purpose was "plainly religious in nature." 449 U.S. 39, 41, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980) (per curiam). Similarly, in *Wallace v. Jaffree,* the Court twice struck down Alabama laws requiring a moment of silence in public schools because the legislature passed them solely for religious purposes. *See* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). Finally, in *Edwards v. Aguillard,* the Court relied on its own reading of a statute that constrained the teaching of evolution in public schools and the statements of the state legislator who sponsored the law to declare the state's alleged secular purpose a sham. *See* 482 U.S. 578, 585-95 & n. 15, 107 S.Ct. 2573, 2578-83 & n. 15, 96 L.Ed.2d 510 (1987). The Court struck the law down because its primary purpose was to advance religion and it therefore had no "clear secular purpose." *Id.* at 585, 107 S.Ct. at 2573. *See also Jager v. Douglas County Sch. Dist.,* 862 F.2d 824, 829-30 (11th Cir.1989) (dismissing the state's asserted secular purpose and

29

striking the state's practice of permitting prayer over a public address system at high school football games as unconstitutional because its actual primary purpose was to advance religion).

This case forces us to decide whether the school board violated the Establishment Clause by attempting to make an end-run around *Lee* when the board's policy has the clearly evidenced, primary purpose and effect of advancing prayer (and thus religion) at public graduations. The Supreme Court's cases, both before and after *Lemon,* suggest that such a policy cannot survive constitutional muster, and even Justice Kennedy's majority opinion in *Lee* contains some (albeit admittedly scant) support for the proposition that the object of the state's exercise may not be to advance religion.[11] On the record available to us in this case, the evidence convincingly demonstrates that the school board acted with the purpose of permitting a student speaker to lead the audience in prayer at high school graduations. In addition to the historical backdrop and the contemporaneous statements of policy makers,[12] the plain terms of the policy indicate the school board's primary purpose to permit prayer. The policy allows a two minute message at the beginning and/or end of the ceremony; one need not be clairvoyant to predict that prayer is the most natural "message" this format is likely to produce. Indeed, one only need be a historian; during the only year for which we have evidence

---

[11]The relevant passage provides:

> The question is not the good faith of the school in attempting to make the prayer acceptable to most persons, but the legitimacy of its undertaking that enterprise at all when *the object is to produce a prayer* to be used in a formal religious exercise which students, for all practical purposes, are obliged to attend.

*See Lee,* 505 U.S. at 588-89, 112 S.Ct. at 2656 (emphasis added).

[12]Neither the Supreme Court nor our own court has felt compelled to ignore record evidence regarding historical realities or the contemporary statements of policymakers in evaluating the religious purpose of a particular policy under *Lemon. See Aguillard,* 482 U.S. at 585-95 & n. 15, 107 S.Ct. at 2578-83 & n. 15; *Wallace v. Jaffree,* 472 U.S. at 56-59, 105 S.Ct. at 2489-91; *Church of Scientology v. City of Clearwater,* 2 F.3d 1514, 1527, 1530-34 (11th Cir.1993); *Jager,* 862 F.2d at 829-30. As the majority notes, the district court committed error when it acknowledged that our decision in *Jager* relied upon such evidence but ignored the case on this point in part because the *Jager* panel was not unanimous. *See Adler I,* 851 F.Supp. at 452 n. 8. Just as split decisions from the Supreme Court bind all lower courts, district courts are not free to disregard circuit precedent on the ground that a particular panel did not speak with one voice.

in the record, the policy produced student-led prayer from the podiums of ten out of seventeen graduation ceremonies. Under such circumstances, I believe that the principles crafted in the cases discussed above require us to hold the policy unconstitutional, without regard to *Lee* or even specific citation to *Lemon.*

Having concluded that *Lemon v. Kurtzman* has survived as a matter of general Establishment Clause jurisprudence and that the case's three-pronged analysis—or at least the principles underlying that analysis—remains relevant on the more particular question of prayer at public high school graduations, it remains only to say that I agree with the majority's application of the *Lemon* framework to the facts of this case. In my view, the religious purpose and effect of the school board's policy are plain in the record and on the face of the policy; the policy, therefore, cannot stand.

MARCUS, Circuit Judge, dissenting:

The court today holds that the Duval County school system's policy of permitting graduating students to vote on whether to select a student to deliver an unrestricted message at the opening or closing of a high school graduation ceremony violates the Establishment Clause of the First Amendment. The majority finds Duval County's policy facially unconstitutional simply because the school sponsors the ceremony and provides the platform and opportunity for a student to deliver a message that may or may not have any religious content. In the process, the majority opinion has come perilously close to pronouncing an absolute rule that would excise *all* private religious expression from a public graduation ceremony, no matter how neutral the process of selecting the speaker may have been, nor how autonomous the speaker was in crafting his message. By somehow transforming a private speaker into a state actor and a student's message into the state establishment of religion, the majority has, I believe, misapprehended the Supreme Court's Establishment Clause jurisprudence, and has ignored the "crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Board of Educ. v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion). I, therefore, respectfully dissent.

31

I.

The central issue presented in this case is whether the Establishment Clause dictates that every form of religious expression be eliminated from graduation ceremonies, no matter who may express it. The majority recognizes, as it must, that the Supreme Court has never levied a *per se* ban on all religious expression at high school graduation ceremonies, and it appears to accept, at least in a general way, that in the public school context, Establishment Clause jurisprudence is of "necessity one of line-drawing," *Lee v. Weisman,* 505 U.S. 577, 598, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), "sometimes quite fine, based on the particular facts of each case," *Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 847, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (O'Connor, J., concurring). Indeed, the majority opinion begins its discussion, as it must, with an examination of *Lee v. Weisman,* where the Court had occasion to visit for the first time the question of school prayer at a high school graduation ceremony. In *Lee,* Justice Kennedy, writing for the majority, took special care "to recognize that, at graduation time and throughout the course of the education process, there will be instances when religious values, religious practices, and religious persons will have some interaction with the public schools and their students." *Lee,* 505 U.S. at 598-99, 112 S.Ct. 2649 (citing *Board of Educ. v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990)); *see also id.* at 630 n. 8, 112 S.Ct. 2649 (Souter, J., concurring) (citing *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986)).

Instead of purging graduation ceremonies of all prayer, *Lee* calls for the difficult task of separating a student's private message, which may be religious in character, from the school board's religious speech, protecting the former and prohibiting the latter. Close attention to the Duval County policy leads me to the conclusion that the policy is facially constitutional.

A.

The facts needed to measure the *facial* constitutionality of the School Board's policy are straightforward, uncontroverted, and laid out fully by the district court in *Adler v. Duval County School*

32

*District,* 851 F.Supp. 446 (M.D.Fla.1994) ("*Adler I* "), *vacated as moot,* 112 F.3d 1475 (11th Cir.1997) ("*Adler II* ").[1]  Invocations, benedictions, and other religious prayers or messages were traditionally offered by clergy and others at public high school commencement ceremonies in the Duval County School District. In 1992, following the decision in *Lee v. Weisman* (holding that a Providence, Rhode Island school principal, acting in accord with school board policy, violated the Establishment Clause by inviting a local clergyman to deliver a nonsectarian prayer at graduation), the Duval County Superintendent, Larry Zenke, instructed Vicki R. Reynolds, the school district's legal affairs officer, to research the issue further.  Reynolds advised Superintendent Zenke that it would be permissible for principals to allow student-initiated and student-led prayer during graduation ceremonies if the school authorities were not involved in the decision-making process.  *See Adler I,* 851 F.Supp. at 448.

---

[1]My views are based on Duval County's policy as written, not as applied.  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).  Whether there are serious constitutional questions regarding the *application* of the policy at certain graduation programs remains to be seen, but I do not think we are in the best position to resolve these issues now.  As I understand the procedural history of the case, the district court's consolidation of the action on the merits with the hearing on appellants' motion for preliminary injunction prevented appellants from fully developing the record for graduation ceremonies after 1993.  On May 28, 1998, when it consolidated the action, the district court took judicial notice of its opinion in *Adler I,* 851 F.Supp. 446 (M.D.Fla.1994).  Because the consolidation truncated discovery, the record consists almost entirely of material derived from *Adler I.* This record is of little aid to the appellants claiming money damages for injuries sustained at graduation ceremonies in 1995 (Joshua Weihnacht), 1997 (Monica Juodvalkis), or 1998 (Emily Adler, Seth Finck, Jonathan Rand, and Bonnie Bear), because the manner in which the policy was applied in 1993 and 1994 has no relevance to the appellants' claims for money damages.  In *Adler II,* 112 F.3d 1475 (11th Cir.1997), we stated that "[w]hether [the students] are entitled to damages depends entirely on the circumstances under which the prayer was delivered at their graduation ceremony." *Id.* at 1479-80.  Thus, in order to recover monetary damages, an appellant needs to demonstrate that the prayer given at his or her graduation ceremony was delivered in an unconstitutional fashion, regardless of whether the policy itself is unconstitutional.  *See id.* at 1479.  I don't believe this analysis can be made as the record now stands.  Therefore, I agree with the majority opinion that whether the policy passes facial constitutional muster or not, the case should be remanded to allow appellants to pursue discovery on events occurring after 1993, and to permit the district court to conduct a factually based as-applied analysis.  *See, e.g., Bowen v. Kendrick,* 487 U.S. 589, 591, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988).

On May 5, 1993, she issued a memorandum ("The Reynolds Memorandum") to all high school

principals, which remains the operative policy for student messages at graduation ceremonies in the Duval

County School District. The Reynolds Memorandum provides in part:

> You will recall that after the 1992 Supreme court case of *Lee v. Wiseman* [sic], you received a memorandum from me instructing that because of the decision, we would no longer be able to have prayers at graduation ceremonies. Most of you have recently been bombarded with information, as have I, regarding whether or not student initiated and led prayers are acceptable based upon a recent Fifth Circuit opinion. The purpose of this memorandum is to give you some guidelines on this issue if the graduating students at your school desire to have some type of brief opening and/or closing message by a student.
>
> This area of the law is far from clear at this time, and we have been threatened by lawsuits from both sides on the issue depending on what action we take. The key to the *Lee v. Wiseman* [sic] decision was that the prayer given at that graduation ceremony was directed and initiated by the school system, which made it unconstitutional, rather than by permissive student choice and initiative. With that premise in mind, the following guidelines may be of some assistance:
>
> 1. The use of a brief opening and/or closing message, not to exceed two minutes, at high school graduation exercises shall rest within the discretion of the graduating senior class;
>
> 2. The opening and/or closing message shall be given by a student volunteer, in the graduating senior class, chosen by the graduating senior class as a whole;
>
> 3. If the graduating senior class chooses to use an opening and/or closing message, the content of that message shall be prepared by the student volunteer and shall not be monitored or otherwise reviewed by Duval County School Board [sic], its officers or employees;
>
> The purpose of these guidelines is to allow the students to direct their own graduation message without monitoring or review by school officials.

*Id.* at 449.

In 1993, under this policy, ten of seventeen high school graduation ceremonies had some form of

student delivered religious message. At the other seven graduations, there were no student messages at all

or the messages were entirely secular in character. *See id.* at 449-50. There is no tabulation in the record of

comparable statistics for subsequent graduations.

B.

*Lee v. Weisman* presents the analytical framework against which to measure the Duval County policy,

and resort to *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105 (1971), may be unnecessary. But whether

34

measured against the *Lee* framework or *Lemon,* to my thinking, the policy passes facial constitutional muster. In *Lee,* Justice Kennedy wrote that "the controlling precedents as they relate to prayer and religious exercise in primary and secondary public schools compel the holding here that the policy of the City of Providence is an unconstitutional one. We can decide the case without reconsidering the general framework by which public schools' efforts to accommodate religion are measured." 505 U.S. at 586-87, 112 S.Ct. 2649. The conclusion that we should measure the policy at issue by comparing it to the *Lee* analysis is bolstered by the concurring opinions of Justices Blackmun and Souter and the dissent of Justice Scalia. Notably, none of the Justices employed the *Lemon* test in *Lee.*

Justice Blackmun, concurring in an opinion joined by Justices Stevens and O'Connor, formulated the applicable test in these terms: "[n]early half a century of review and refinement of Establishment Clause jurisprudence has distilled one clear understanding: Government may neither promote nor affiliate itself with any religious doctrine or organization, nor may it obtrude itself in the internal affairs of any religious institution." *Id.* at 599, 112 S.Ct. 2649 (Blackmun, J., concurring). Justice Souter, also concurring in an opinion joined by Justices Stevens and O'Connor, likewise did not apply *Lemon* 's three-part test. For him the "principle against favoritism and endorsement has become the foundation of Establishment Clause jurisprudence, ensuring that religious belief is irrelevant to every citizen's standing in the political community." *Id.* at 627, 91 S.Ct. 2105 (Souter, J., concurring). Finally, dissenting, Justice Scalia, writing for himself, Chief Justice Rehnquist, and Justices White and Thomas, observed that the Court's opinion had demonstrated the "irrelevance of *Lemon* by essentially ignoring it ... and the interment of that case may be the one happy byproduct of the Court's otherwise lamentable decision." *Id.* at 644, 91 S.Ct. 2105 (Scalia, J., dissenting).

In *Lee,* the Supreme Court pointed at two "dominant facts" as marking the boundaries of its decision: first, the Providence school officials ordained and directed the performance of a *religious* exercise by deciding to include prayer in the graduation ceremony, by selecting a clergyman to deliver the prayer, and

by providing the clergyman with guidelines informing the content of the prayer; second, pressure was exerted on students to attend graduation and conform with their peers. *See id.* at 586-88, 112 S.Ct. 2649. What the Supreme Court found troubling about *Lee* was that the government clearly directed a formal religious exercise—albeit in the form of a nonsectarian prayer—under such circumstances as to oblige the participation of many who objected. As Justice Kennedy wrote:

> These dominant facts mark and control the confines of our decision: State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools. Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma.

*Id.* at 586, 112 S.Ct. 2649. There can be little doubt, then, that in *Lee,* the Providence, Rhode Island school system ordained and established a religious exercise at a graduation ceremony. The graduation prayer delivered by a rabbi was in every sense the state's prayer.

In striking contrast, under the Duval County policy, however, neither the School Board nor its principals may ordain, establish or direct that a prayer or a message of any kind shall be delivered at graduation. Indeed, the Duval County policy explicitly divorces school officials from the decision-making process as to whether any message—religious or not—may be delivered at graduation. Moreover, under the policy, the School Board and its agents have no control over who will draft the message, if there be any message at all, or what its content may be. According to Duval County policy, school officials merely allow the graduating class to decide whether or not to have a speaker deliver a message at graduation, and, if so, it's left to the student body to select that speaker. Indeed, the special concurrence concedes that the policy "sets forth secular criteria for selecting speakers." Special Concurrence at 2438 n. 4. The School Board does not suggest in any way, let alone require the graduating class to consider religious criteria or any other criteria in deciding whether or not to have a student speaker or in selecting the speaker. And most notably for me, if the graduating class chooses to have a message, the content of the message shall be prepared by the student speaker alone and no one else. The Duval County School Board is prohibited by the very terms of its policy

36

from monitoring or otherwise reviewing the message in any way. On the face of the policy, the students unambiguously understand that any student message is utterly divorced from School Board sponsorship. In short, I cannot conceive of how a message delivered by a student under these circumstances can be characterized as the state's message or how a policy allowing the delivery of an autonomous message can be seen as the state direction of prayer.

The Supreme Court struck down the policy in *Lee* precisely because Providence school officials directed the performance of a "formal religious exercise." 505 U.S. at 586, 112 S.Ct. 2649. The Court did not suggest that school sponsorship of the graduation event, standing alone, was sufficient to find the Providence policy unconstitutional, or it would have banned all religious expression at graduation. The majority here contends that the control exerted by the school district over the graduation ceremonies affixes the imprimatur of the state on any religious message delivered by any student. While the majority opinion acknowledges that *Lee* is distinguishable from this case, it nevertheless concludes that the Duval County School Board policy fails to erase the imprint of the state from student messages at graduation ceremonies. *Lee* does not support this rationale for finding the School Board policy unconstitutional.

The majority's holding which, in essence, requires schools to banish religion from all events in which there is school control, is far-reaching and goes further than the Establishment Clause requires. Following the majority's reasoning, the religious content of any speech at a graduation ceremony is likely attributable to the school merely because the school sponsors the event. As a result, schools would have to prevent any speaker, including speakers as diverse as athletes, politicians, academics, entertainers, maybe even judges, from discussing a religious topic or invoking the Lord's name, to ensure that no audience member perceives that the school is endorsing the speaker's religious message. By that logic, those speakers would bear the imprimatur of the state simply because they were selected by the school to speak at an event over which the school has great control. But a graduation free of all religious expression is not required by the Establishment Clause. The Supreme Court has repeatedly held that neutrality, not hostility, toward religious expression is

37

required by the Establishment Clause. Indeed in *Lee* the Court recognized that "[t]he First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." 505 U.S. at 589, 112 S.Ct. 2649; *see also Agostini v. Felton,* 521 U.S. 203, 231, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (observing that there is no advancement of religion where "aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis"); *Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 839, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion."); *Board of Educ. v. Grumet,* 512 U.S. 687, 696, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (" 'A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of "neutrality" toward religion.' " (quoting *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 792-93, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973))); *Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954 (1952) ("[W]e find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence."). What the Establishment Clause bars is *state sponsorship* of religion or prayer in the context of public school graduation ceremonies.

How then, does the majority opinion, or the special concurrence, propose to convert a private speaker who is selected through a wholly neutral process, and who is given complete autonomy over the content of her speech, into a public, state sponsored speaker? Two basic arguments are offered. First, the majority contends that by providing the platform and opportunity, the state has created a sufficient link to the student speaker to convert the student's private speech into public, state sponsored speech. Second, both the majority and the special concurrence suggest that the *process* of selecting the speaker shrouds the otherwise private speech with the imprint of the state. The first argument—that by providing the platform, the speech becomes

public—goes too far. The second—that the speaker somehow garners state authority by virtue of the plebiscite—has no logical rationale.

Even if we accept that the Duval County School Board exerted "overwhelming control" over the graduation ceremony, it is clear that it did not have control over the elements which are most crucial in this calculus: the selection of the messenger, the content of the message, or most basically, the decision whether or not there would be a message in the first place. On the face of the policy, the students alone decide both whether there will be a message, and, if so, who the messenger will be. By suggesting that the state has "directed" prayer, the special concurrence has misapprehended the School Board policy. Special Concurrence at 2437 n. 2. In essence, this case is indistinguishable from *Doe v. Madison School District No. 321,* 147 F.3d 832 (9th Cir.1998), *withdrawn & reh'g en banc granted,* 165 F.3d 1265 (9th Cir.1999), where the Ninth Circuit held that graduation speech does not bear the imprimatur of the state when the speaker is a student, not a cleric; the student speaker is selected on neutral and secular criteria; and the student has complete autonomy over content.[2] *See id.* at 835-37.

---

[2]The other cases that have considered student-initiated prayer at graduation are of limited assistance; none, except for *Doe v. Madison School District No. 321,* examine a policy which mirrors Duval County's in its neutrality. Notably, all of the other cases allow for students to vote directly on whether or not to have prayer at graduation. These cases either uphold or strike down such policies. *Jones v. Clear Creek Independent School District,* 977 F.2d 963 (5th Cir.1992), is the only case which has permitted students to vote directly on whether to have prayer at graduation. In *Jones,* the Fifth Circuit upheld the Clear Creek, Texas school district's policy allowing students to decide if they wanted volunteers to deliver "nonsectarian and nonproselytizing" invocations at graduation. *See id.* at 965. The court found that the Clear Creek policy reserved to the students the decision whether to have an invocation, precluded anyone but a student volunteer from delivering an invocation, and placed less psychological coercion on students than the prayers had on graduates in *Lee* because students were aware that any prayers given represented the will of their peers. *See id.* at 970-71.

The Fifth Circuit recently revisited the issue of student-initiated prayer in *Doe v. Santa Fe Independent School District,* 168 F.3d 806 (5th Cir.1999). There the Fifth Circuit examined what it considered to be the holding of *Jones*—"that student-selected, student-given, nonsectarian, nonproselytizing invocations and benedictions at high school graduation ceremonies" are constitutional—and concluded that the constitutionality of a Clear Creek-type prayer policy depends on its "nonsectarian and nonproselytizing" features. *Santa Fe,* 168 F.3d at 811. The majority opinion relies on *Santa Fe* for the proposition that a policy which "permits" sectarian and proselytizing prayers is *a priori* unconstitutional. This argument proves too much

The majority insists that the delegation of responsibilities to nongovernmental actors does not altogether absolve the state of its constitutional duty. Stated at so high an order of abstraction, I can readily accept that premise. But the Duval County School Board in no way delegated any state authority to the students by providing them the opportunity to decide if they wanted a student message, and to select a student speaker if they so chose. The majority has in no way proven that the students' private conduct has become so "entwined with government policies" and so "impregnated with governmental character" as to become subject to the constitutional limitations placed on state action. *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). In fact, the state's only involvement in the message is to provide students with the opportunity to vote, and to impose a time limit of two minutes. Neither of these facts establishes that the state has so insinuated itself into the decision that it can transform private speech into an utterance of the state. Nevertheless, the majority opinion goes so far as to suggest that the student's topical choice, which everyone

---

and is offensive to the Constitution. The Duval County policy, of course, permits sectarian and proselytizing prayers because it places no limitations, either secular or sectarian, on the content of a graduation message. A policy of free expression is far more consonant with the commands of the First Amendment than is a policy of censorship. *See, e.g., Board of Educ. v. Mergens,* 496 U.S. 226, 253, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion) ("[A] denial of equal access to religious speech might well create greater entanglement problems in the form of invasive monitoring to prevent religious speech at meetings at which such speech might occur."); *Santa Fe,* 168 F.3d at 824-28 (Jolly, J., dissenting).

In *ACLU of New Jersey v. Black Horse Pike Regional Board of Education,* 84 F.3d 1471 (3d Cir.1996) (en banc), the Third Circuit, sitting *en banc,* held unconstitutional a school board's policy that permitted the senior class to vote on whether to include a prayer at high school graduation ceremonies. *See id.* at 1477-88. The policy in *Black Horse Pike* allowed senior class officers to conduct a poll of the graduating class to determine, by plurality vote, whether seniors wanted "prayer, a moment of reflection, or nothing at all" to be included in their graduation ceremony. *Id.* at 1475. Finally, in *Harris v. Joint School District No. 241,* 41 F.3d 447 (9th Cir.1994), *vacated as moot,* 515 U.S. 1155, 115 S.Ct. 2604, 132 L.Ed.2d 849 (1995), the high school students voted by written ballot on whether or not to have prayer, and, if the students voted for prayer, on whether a minister or a student would say the prayer. *See id.* at 452-53. The *Harris* court found that the state involvement in the case was pervasive enough to offend Establishment Clause concerns. The court noted that "[t]he message of the speakers is ... chosen by the majority; the relevant speakers are instructed to pray." *Id.* at 456-57.

In contrast to each of these policies, Duval County students vote on whether to have a message of unspecified content delivered by a student. This is the critical distinction.

concedes is made in a purely autonomous manner, is still attributable to the state, and says that this control cannot be erased through delegation of one portion of the ceremony. The majority opinion assumes what it cannot prove—that utterances made on a state platform are automatically transformed from private into public speech. It is beyond my imagination to say that everyone on the platform at a high school graduation ceremony, including a local politician or celebrity, is a state speaker merely because the state has provided the platform, onto which private individuals may be invited to share their privately held views. Such private speech does not become the state's merely by being uttered at a state event on a state platform.[3]

The Duval County policy permits graduating students to decide through majority/plurality vote whether a student volunteer shall deliver a message. It does not direct what the message will be. The state here coerces nothing—it merely offers to students the opportunity to vote for or against a message, but does not compel the answer. The majority opinion takes a neutral process and an autonomous speaker and recasts it as an arm of state coercion, even though there is no preordained religious result.

---

[3]Simply providing a platform on a neutral basis is not enough to convert private action into state action. In a series of cases granting religious groups access to generally available facilities or benefits, i.e., "open forum" cases, the Supreme Court has suggested that the mere location or platform of religious speech is insufficient to transform private speech into the state's speech. The Court has, on numerous occasions, rejected the argument that the Establishment Clause allows restrictions on access by religious organizations to government programs or premises, otherwise open to all groups. By providing students who hold religious views with the same opportunity to enjoy generally available facilities and benefits, schools act neutrally. *See Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 832, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (holding that the University of Virginia violated the Free Speech Clause when it refused to pay for a religious student organization's publication costs under a program that funded other student organization publications); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 395, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (striking down as violative of the Free Speech Clause a school district regulation authorizing use of school property for political, social, civic, or recreational uses but denying religious groups the same access); *Board of Educ. v. Mergens,* 496 U.S. 226, 235, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (upholding Equal Access Act prohibiting public secondary schools which have a "limited open forum" from denying access to students who wish to meet in that forum "on the basis of the religious, political, philosophical, or other content of the speech at such meetings"); *Widmar v. Vincent,* 454 U.S. 263, 273-74, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (holding that a university regulation denying religious groups access to school facilities violated the Free Speech Clause; any benefits to religion by providing "equal access" to facilities would be "incidental").

Nevertheless, the majority and the special concurrence would proscribe a policy that on its face plainly allows a student to select her own message, fearful that on occasion that message may be a prayerful one. It is worth repeating, however, that while the state cannot advance religion, similarly, it cannot act in a hostile manner in the face of private religious speech publically uttered. *See Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). If a *per se* rule is erected, that all speech on a platform is state speech, this rule would run afoul of the Free Exercise and Free Speech clauses.[4] If the senior class were asked to vote whether to have a student deliver a poem, or perhaps sing a song, at a graduation exercise, that act is still the selection of a private speaker through neutral criteria. The Duval County policy creates the mechanism whereby the students could elect to have a message and select the speaker and nothing more.

The majority and the special concurrence reason that the policy's delegation to students of the power to vote for a graduation speaker renders that speaker—by virtue of the vote—a state actor. It is this leap of logic, taking the selected student representative and, without explanation, turning her into a state actor, which cannot be sustained. In his concurrence in *Lee v. Weisman,* Justice Souter said that:

> If the State had chosen its graduation day speakers according to wholly secular criteria, and if one of these speakers (not a state actor) had individually chosen to deliver a religious message, it would have been harder to attribute an endorsement of religion to the State.

505 U.S. 577, 631, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Souter, J., concurring). In *Adler,* where the state has not even chosen the private speaker, we have even less than this. *See also Doe v. Madison Sch. Dist. No.*

---

[4]Duval County students possess Free Speech rights, even in a nonpublic forum such as a graduation ceremony. The Supreme Court has held that in nonpublic fora the government may not engage in viewpoint discrimination. *See Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (A "state may reserve [nonpublic] forum for its intended purposes ... as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."). The Court has stated that religion provides "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510.

*321,* 147 F.3d at 836 ("[W]hen a state uses a secular criterion for selecting graduation speakers and then permits the speaker to decide for herself what to say, the speech does not bear the imprimatur of the State.")

The argument is now that the student messenger is a state actor because the democratic process of voting by public school students somehow converts the selected speaker into a public official. But this student is, at most, a representative of the student body, not an official of the state. She is in no way analogous, as the majority opinion suggests, to the School Board president who is, unlike the student, a publically-elected official. She has no power or authority or official capacity to inform, carry out, or guide state policy. It remains unconvincing to argue that the student becomes a state actor because she was chosen by her peers, unless each high school student individually is considered to be a state actor, or somehow the students, acting in concert, come to be vested with the power of the state.

I offer two examples. First, consider the case of the selection of a Homecoming Queen. While she may be selected by a vote, or plebiscite of the entire senior class, the Homecoming Queen cannot be characterized as a state actor, or a representative of the state, merely because she holds a "public" position and sits atop the Homecoming float. Imagine, second, the example of replacing the traditional valedictory address with the practice of affording the students of the graduating class the opportunity to select the graduation student speaker through a vote by the entire class. In this hypothetical, the student speaker is selected, not by the School Board on the basis of grades, but by the students on the basis of student choice—be it popularity, ability to entertain, achievement in athletics, or for some other reason. It strains reason to suggest that, by virtue of her selection by the majority of the senior high school class, the student speaker becomes a mouthpiece of the state. Both examples suggest that the senior class' act of voting does not, in any way, turn the senior class vote into state action, nor turn the chosen student into a state actor. Because Duval County policy utilizes this same methodology, affording the students of the senior class, in a wholly secular way, the opportunity to vote whether or not to have a message and to select a student

43

speaker, this vote is no more vested with the imprimatur of the state than are the votes for graduation class speaker or Homecoming Queen.

It is hard to understand how the principal, school board, or state has sponsored or directed the student speaker's actions when all of the central decisions—who speaks, whether there will be a speaker, and what the content of the speech is—are uncontrolled by the state. Delegation of decision-making to pick a private speaker alone does not place the state's imprint on graduation prayer. The delegation provided to the students—whether or not to have a student message—can in no way be seen as the delegation to a non-governmental actor of some aspect of a practice which tends to establish religion. Where the student is chosen in a neutral and secular way *and* where the student is allowed complete autonomy over the message, the majority's position is untenable.

## C.

The other dominant fact of *Lee,* whether Duval County students are coerced "to support or participate in religion or its exercise," 505 U.S. at 587, 112 S.Ct. 2649, by the School Board policy, is largely determined by the measure of state control over the *message* at a graduation ceremony, rather than state control over the ceremony itself. I do not quarrel with the observations made in *Lee,* that students feel compelled to attend graduation, *see id.* at 595, 112 S.Ct. 2649, and that schools "retain a high degree of control" over graduation ceremonies, *id.* at 597, 112 S.Ct. 2649. But these conclusions do not suffice to decide the issue of coercion. The focus must be on whether the state has endorsed the message in an appreciable manner, which, when combined with the inherent nature of the graduation ceremony, induces students to participate in a religious exercise.

Schools may make private religious speech their own by endorsing it, but schools do not endorse all speech that they do not censor. *See Board of Educ. v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion). We need not assume, as the majority does, that Duval County seniors will interpret the school's failure to censor a student message for religious content as an endorsement of that

44

message. As we have noted, the students clearly understand, by the very terms of the Duval County policy, that any student message is utterly divorced from any School Board sponsorship. While there may still be pressures on students to attend graduation and conform with their peers, the state's control over a religious exercise, essential to *Lee's* holding, *see* 505 U.S. at 590, 112 S.Ct. 2649 ("The degree of school involvement here made it clear that the graduation prayers bore the imprint of the state ...."); *id.* at 597, 112 S.Ct. 2649 ("[T]he state-imposed character of an invocation and benediction by clergy selected by the school combine to make the prayer a state-sanctioned religious exercise ...."), is absent here.

## II.

While the majority opinion seems to acknowledge that the Duval County School Board policy should be measured against the framework of *Lee*—a view I wholly share—it also undertakes a brief analysis of the policy under *Lemon v. Kurtman.* Even if we assume that *Lemon* provides the appropriate analytical vehicle against which to measure the Duval County School Board policy, the policy still withstands facial constitutional challenge. Under the *Lemon* test, the policy must have a secular purpose, it may not have a primary effect that either advances or inhibits religion, and it must not foster an excessive government entanglement with religion. *See Lemon v. Kurtzman,* 403 U.S. 602, 612-13, 91 S.Ct. 2105 (1971). I believe that the School Board policy, on its face, has a secular purpose and violates neither of *Lemon*'s proscriptions.

## A.

The majority and the special concurrence can discern *no* secular purpose in the Duval County School Board policy, brushing aside without comment the purpose, explicitly stated in the policy, "to allow the students to direct their own graduation message without monitoring or review by school officials." Likewise, it ignores the two secular purposes recognized by the district court: "to solemnize the occasion and to observe and protect the right of free speech" of the student speaker. *Adler I,* 851 F.Supp. at 453.

Since *Lemon* provides that a statute must have "*a* secular legislative purpose," 403 U.S. at 612, 91 S.Ct. 2105 (emphasis added), a statute will only violate the Establishment Clause if it is "entirely motivated

by a purpose to advance religion," *Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *see also Bowen v. Kendrick,* 487 U.S. 589, 602, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (a court "may invalidate a statute only if it is motivated wholly by an impermissible purpose"); *Lynch v. Donnelly,* 465 U.S. 668, 680, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) ("The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations."). A statute may satisfy *Lemon's* first prong even if it is "motivated in part by a religious purpose." *Wallace,* 472 U.S. at 56, 105 S.Ct. 2479.

Moreover, the Supreme Court has instructed us to be "deferential to a State's articulation of a secular purpose," *Edwards v. Aguillard,* 482 U.S. 578, 586, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), particularly where "a legislature expresses a plausible secular purpose" for a policy or action, *Wallace,* 472 U.S. at 74-75, 105 S.Ct. 2479 (O'Connor, J., concurring in the judgment). We respect that purpose unless it is insincere or a "sham," *Edwards,* 482 U.S. at 586-87, 107 S.Ct. 2573; *Bown v. Gwinnett County Sch. Dist.,* 112 F.3d 1464, 1468 (11th Cir.1997), or where the statute at issue has a "preeminent purpose" which is "plainly religious in nature," *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam); *see also Edwards,* 482 U.S. at 591, 107 S.Ct. 2573; *Wallace,* 472 U.S. at 56-60, 105 S.Ct. 2479. But the Supreme Court has been reluctant to attribute an unconstitutional motive where a "plausible" secular purpose may be discerned from the statute. *Mueller v. Allen,* 463 U.S. 388, 394-95 & n. 4, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983).

Additionally, "inquiry into legislative purpose begins with interpreting the law itself." *Church of Scientology v. City of Clearwater,* 2 F.3d 1514, 1527 (11th Cir.1993). For the most part, statutes which the Supreme Court has invalidated for lack of secular purpose have openly favored religion or demonstrated a religious purpose on their face. *See, e.g., Edwards,* 482 U.S. at 593, 107 S.Ct. 2573 (invalidating a Louisiana law that required creationism to be discussed with evolution in public schools); *Wallace,* 472 U.S. at 57-58, 105 S.Ct. 2479 (overturning an Alabama statute that authorized a moment of silence because the state made

no attempt to justify the statute in terms of any secular purpose); *Stone,* 449 U.S. at 41, 101 S.Ct. 192 (striking down a Kentucky statute requiring the posting of the Ten Commandments in public classrooms); *Engel v. Vitale,* 370 U.S. 421, 424, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (holding unconstitutional a New York law authorizing state-directed daily classroom prayer in public schools).

Three secular purposes are plainly encompassed by this policy. First, the Duval County policy, on its face, affords graduating students an opportunity to direct their own graduation ceremony by selecting a student speaker to express a message. I do not understand how this purpose of allowing students to share in the decision-making process concerning the shape of their own graduation is denuded of a legitimate secular purpose, simply because an autonomous student speaker chosen by neutral criteria may express a prayerful message. The majority presumably would admit a legitimate secular purpose if the School Board had decided to allow students of the graduating class to select the student graduation speaker through class vote rather than by class rank. Doing so allows the graduating high school seniors to share civic responsibility in shaping their ceremony. The Duval County School Board has done no more here.

Moreover, the School Board policy evinces another legitimate secular purpose in allowing students to solemnize the event as a seminal educational experience. *See Chaudhuri v. Tennessee,* 130 F.3d 232, 236 (6th Cir.1997); *Tanford v. Brand,* 104 F.3d 982, 986 (7th Cir.1997); *Jones v. Clear Creek Indep. Sch. Dist.,* 977 F.2d 963, 966-67 (5th Cir.1992); *cf. Lynch v. Donnelly,* 465 U.S. 668, 693, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). This purpose is not vitiated of its secular character merely because the policy invites consideration of meaning and values in the context of a graduation ceremony. And it would be very damaging to public education if the Establishment Clause were to be seen as inhibiting any reflection by a student of transcendent meaning and value in life, whether grounded in religion or not.

Finally, the School Board's policy also evinces an important and long accepted secular interest in permitting student freedom of expression, whether the content of the expression takes a secular or religious form. *See Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 760, 115 S.Ct. 2440, 132

47

L.Ed.2d 650 (1995) ("Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression."); *Board of Educ. v. Mergens,* 496 U.S. 226, 249, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion) ("[P]revent[ing] discrimination against religious and other types of speech" has an "undeniably secular" purpose.); *Americans United For Separation of Church and State v. City of Grand Rapids,* 980 F.2d 1538, 1543 (6th Cir.1992) (en banc) ("[A] policy of treating religious speech the same as all other speech certainly serves a secular purpose.").

Nevertheless, the majority opinion and special concurrence suggest that the policy has no "clear" or "legitimate" secular purpose, and posit three pieces of evidence to show that any avowed secular purpose is actually a "sham." First, the majority says that the School Board promulgated the policy as a means to evade the strictures of *Lee;* second, the policy's solely sectarian purpose is said to be established by examining the title of the Reynolds Memorandum, "Graduation Prayer"; and finally, the majority suggests that comments made by some members of the School Board, notably after the policy had been promulgated and distributed in Duval County, likewise evinces a *wholly* sectarian purpose.

In the process of erecting this argument, the majority opinion, without any authority, ignores the text of the policy and its explicitly stated secular purpose, as if there were none. The majority would divine a *wholly* sectarian purpose merely by looking at the antecedent history, the title, and the post-enactment debate. It would be an especially dangerous practice if a court could somehow discern legislative purpose, not from the text of the policy, nor from its explicitly stated purpose, nor even from a decision-making body that has offered no debate from which to find purpose, but, rather, simply from the controversy surrounding the subject and the heartfelt and often conflicting views expressed by many members of the community. A review of the pertinent history, however, yields only the observations that Duval County had a long tradition of clergymen offering prayers at commencement ceremonies, that in the wake of *Lee* in 1992, the School Board terminated the practice, and that thereafter, many members of the community expressed strong views

48

about the policy one way or the other. "[W]hile it is possible to discern the objective 'purpose' of a statute (i.e., the public good at which its provisions appear to be directed), or even the formal motivation for a statute where that is explicitly set forth, ... discerning the subjective motivation of those enacting the statute is, to be honest, almost always an impossible task. The number of possible motivations, to begin with, is not binary, or indeed finite." *Edwards v. Aguillard,* 482 U.S. 578, 636-37, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting).

In this case we have no record from which to fairly infer the motivation of those who promulgated or distributed the policy. In so far as we attempt to divine purpose from the decision-makers, "to the extent that the School Board was the institutional policy maker (rather than Superintendent Zenke and/or Ms. Reynolds)," the district court found that the "purposes or intentions of the members of the Board are unknown. No debate was had and no vote was taken on the Reynolds Memorandum of May 5." *Adler I,* 851 F.Supp. at 451. To the extent that we focus on the motives of Mr. Zenke or Ms. Reynolds, the district court found mixed motives or purposes—to permit students to solemnize the event, to afford the student body the opportunity to select a messenger, who, in turn would, with complete autonomy, choose a secular or sectarian message, and to afford the students the option of having no message at all. *See id.* at 452. The majority opinion offers no reason to disturb the district court's findings which are grounded in the facially neutral language of the Reynolds Memorandum.

The majority opinion also suggests that the title of the Reynolds Memorandum, "Graduation Prayer," supports the conclusion that the School Board policy was driven solely by sectarian concerns. The title, however, merely introduces the topic of debate within Duval County in the aftermath of *Lee,* rather than suggesting, let alone compelling, the outcome of that debate. The title affixed to the Reynolds Memorandum does no more than alert the reader to the general subject matter of the text; but it remains the language and substance of the policy, rather than its title that is controlling. It is altogether unnecessary to requisition the title to cast doubt on the clear and unambiguous purpose of the policy. The crucial term "message" is fully

49

defined by the text of the policy, which provides that the decision whether to have a message is left to the students, that the student body shall choose the student speaker, that the message is limited to two minutes in length, that the message shall take place at the beginning and/or closing of the graduation ceremony, and, finally, that the content of the message shall be prepared by the student speaker without monitoring or review by the School Board. The title cannot take the place of a detailed review of the policy's facial provisions, let alone create a wholly sectarian purpose out of a textually neutral pronouncement.

Besides being unnecessary, use of the title to inform the plain meaning of the policy's language is improper. Indeed even if we were examining the title of a statute or legislative codification—and we are doing far less than that here—the Supreme Court has warned that "the title of a statute and the heading of a section cannot limit the plain meaning of the text. For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co.,* 331 U.S. 519, 528-29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). The Eleventh Circuit and its predecessor court have repeatedly employed this principle of statutory construction when interpreting the statutory text. *See, e.g., North Ala. Express, Inc. v. Interstate Commerce Comm'n,* 971 F.2d 661, 664 (11th Cir.1992) ("Section and chapter titles cannot alter the plain meaning of a statute; they can only assist in clarifying ambiguity."); *Scarborough v. Office of Personnel Management,* 723 F.2d 801, 817 (11th Cir.1984) ("[R]eliance upon heading to determine the meaning of a statute is not a favored method of statutory construction."); *Rich v. Commissioner of Internal Revenue Serv.,* 250 F.2d 170, 175 (5th Cir.1957) ("[T]he plain and unambiguous meaning of the text of the section cannot be extended by its title or heading.").

Finally, the majority opinion points to post-enactment comments of some members of the School Board made at a June 1, 1993 meeting as evidence of the School Board's *wholly* sectarian purpose to "permit" graduating students to pray. However, the district court observed that "[t]he motivation or intent of the Board relative to the Reynolds Memorandum of May 5 is essentially unknown." *Adler I,* 851 F.Supp. at 452. No

50

debate was had and as far as the record reflects, no vote was taken on the Reynolds Memorandum. The June 1st comments were made almost a month *after* the policy was promulgated and distributed, in the context of a proposal to replace student-initiated messages with a moment of silence. The motion failed, and the policy was left in force. The most one could say is that the statement of one Board member at the June 1st meeting could be characterized as advocating direct school involvement with religion at graduation ceremonies.[5] Simply put, the post-enactment comments are not sufficient to transform the policy's express secular purpose into a preeminently religious purpose.

More importantly, regardless of how these *post hoc* statements are interpreted, they cannot be construed to override the policy's language articulating a clear secular purpose. *See Bown v. Gwinnett County Sch. Dist.,* 112 F.3d 1464, 1472 (11th Cir.1997). Indeed in *Bown,* this Circuit had occasion to find that the legislative history of a Georgia statute (mandating a period for quiet reflection in public schools), which

---

[5]The majority opinion offers four post-enactment statements of School Board members to show that the School Board intended to permit graduating students to engage in prayer. In fact, the statements to which the majority refers generally buttress the conclusion that the School Board's policy was not a sham. Of those four statements, only the statement of Board member Bill Parker can be characterized as advocating direct school involvement with religion at graduation ceremonies. *See* Tr. of Duval County Sch. Bd. Meeting at 2 ("I think that our school principals should be allowed to work out a non-sectarian message with our student chaplains, or a guest minister, rabbi or whatever that would be acceptable to all at this very important time in our young people's lives."). The statements of Don Buckley and Nancy Corwin, while generally supportive of religion, acknowledge that an intended effect of the policy is to insulate the content of messages from school influence. *See id.* at 5 (Buckley) ("I think the only way we can keep ourselves clear on this thing is to keep ourselves out of what happens in this area of the graduation ceremony."); (Corwin) ("I also believe that the democratic process in which seniors were given the ability to choose which form of inspirational message, if any, they wanted at their commencement was an appropriate one and I'm going to stand by it."). Rather than betraying an illegitimate intent to ensure that prayer take place at graduation ceremonies, these statements indicate that Buckley and Corwin perceived the School Board policy as disassociating the school hierarchy from student messages. The fourth statement referenced by the court, that of Board member Stan Jordan, was also supportive of the policy. *See id.* at 8 ("I plan to vote for the administration plan and against the proposal that's on the table."). Taken as a whole these utterances by School Board members constitute recognition that the old regime of state-directed school prayer in Duval County had passed and been replaced by a new regime over which they had far less control.

contained some expressions of religious motives for voting for the Act, could not "override the express statutory language articulating a clear secular purpose."[6] *Id.*

In sum, whether standing alone or in concert, the three pieces of evidence cited by the majority cannot strip the policy of *a* secular purpose. No matter what an individual board member may have hoped—and they said nothing on the record about codifying *this* policy—Duval County's policy is facially neutral and undeniably evinces a secular purpose. That is enough to pass constitutional muster under *Lemon.*

B.

As for whether the policy has the primary effect of advancing religion, I do not see how a policy that on its face strips the School Board of any authority over the central decisions—who speaks, whether there will be a speaker, or what the content of the speech may be—can have the primary effect of advancing religion in any way. *See Doe v. Madison Sch. Dist. No. 321,* 147 F.3d 832, 835 (9th Cir.1998), *withdrawn & reh'g en banc granted,* 165 F.3d 1265 (9th Cir.1999). As the district court found, the implementation of the policy may result in no prayer at all. *Adler I,* 851 F.Supp. at 454. Indeed, in order to ensure that no one perceives any student's religious utterance as being the state's prayer, the policy explicitly divorces any student message from School Board sponsorship.

The Duval County School Board policy does not guarantee that a prayer will be uttered or that religion will be aided; any such result is wholly dependent on a private actor making an autonomous decision to deliver a prayerful message. The Supreme Court has repeatedly upheld facially neutral programs that may

---

[6]The majority opinion's reliance on *Jager v. Douglas County School District,* 862 F.2d 824 (11th Cir.1989), as controlling, or at least informing the secular purpose inquiry in this case is misplaced. It cites *Jager* for the proposition that when a policy's "actual purpose" is religious, or "intrinsically religious," *id.* at 830, it cannot meet the secular purpose prong of *Lemon.* But *Jager* does no more than state the obvious, that in order to meet *Lemon's* first prong, a government policy must have a genuine secular purpose and not be a sham. *See Edwards v. Aguillard,* 482 U.S. 578, 586-87, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). If a policy's "actual purpose" is wholly religious then *Lemon's* secular purpose requirement is not satisfied. In *Jager,* we held that a school district's practice of having representatives of student organizations deliver invocations prior to football games had as its "preeminent purpose" the endorsement of Protestant Christianity. 862 F.2d at 830. The only discretion left to the students was the selection of who would pray.

52

permit an individual to support religion. *See, e.g., Agostini v. Felton,* 521 U.S. 203, 223-232, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (upholding New York program of sending public school teachers into parochial schools to provide remedial education where aid was made available to religious and secular beneficiaries on a nondiscriminatory basis); *Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 8-12, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) (sustaining section of Individual with Disabilities Act providing disabled children with aid regardless of whether a child attends a sectarian institution); *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 487-89, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (holding that Establishment Clause not violated when the state paid a blind student's tuition at a Christian college through a generally-applicable aid program, and observing that aid reach a religious institutions "only as a result of the genuinely independent and private choices of aid recipients"); *Mueller v. Allen,* 463 U.S. 388, 397-99, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (upholding a state tax deduction for specified educational expenses, and characterizing any such aid to religion as being "only as a result of numerous private choices of individual parents of school-age children").

C.

For many of the same reasons, I would find that the School Board's policy does not excessively entangle the Board with religion in violation of the third part of the *Lemon* test. The policy remains facially neutral with respect to religion, requiring only that graduation messages be voted on by students, and composed and directed by a student speaker. By its very terms, the policy explicitly prohibits any review of the student message at all. Undoubtedly, the School Board would find itself far more entangled with religion if it attempted to eradicate all religious content from student messages than if it maintained a meaningful policy of studied neutrality. *See Board of Educ. v. Mergens,* 496 U.S. 226, 253, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion); *Widmar v. Vincent,* 454 U.S. 263, 272 n. 11, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Chabad-Lubavitch v. Miller,* 5 F.3d 1383, 1389 (11th Cir.1993) (en banc); *Jager v. Douglas County Sch. Dist.,* 862 F.2d 824, 831 (11th Cir.1989).

While the majority today holds only that the Duval County School Board's policy is facially unconstitutional, implicit in its rationale is the need for school censorship if schools are to allow students the opportunity to speak at graduation at all. At the core of the court's holding is "the state's control over nearly all aspects of the graduation ceremony." But the degree of control that schools generally exert over high school graduation ceremonies is unlikely to diminish because graduation ceremonies are, by their nature, highly choreographed. The majority opinion therefore leaves school officials with only two choices: either eliminate student speech altogether or retain student speech, subject to censorship by school authorities. If school officials choose the latter course, they will be left with the unenviable task of identifying the religious content in student speeches for excision;[7] if, however, they choose the former, they will have deprived the graduation class of any role in shaping its high school graduation and they will have banned all private student expression. For me, the Establishment Clause requires no such Hobson's choice. What it does require is a recognition of the critical difference between a private statement of religious values and a religious utterance endorsed by the state. The Duval County School Board's policy has done no more than that. I would, therefore, affirm the judgment of the district court.

---

[7]There is no easy or precise guideline for school officials to follow when excising student speech of religious content. The constitutional definition of religion is expansive; it encompasses "all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinated or upon which all else is ultimately dependent"and "which occupies in the life of its possessor a place parallel to that filled by [ ] God." *United States v. Seeger,* 380 U.S. 163, 176, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). Moreover, the belief "need not be acceptable, logical, consistent, or comprehensible to others." *Thomas v. Review Bd.,* 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Indeed, if the School Board's censorship is not "rigorous" enough and thereby allows religion to creep into graduation ceremonies, a policy of allowing monitored student speech may still be subject to constitutional attack.